Filed 2/21/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE ANTONIO JIMENEZ,<br><br>    Defendant and Appellant. | D073313<br><br><br><br>(Super. Ct. No. SCN371164 ) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed and remanded for resentencing.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Kelley Johnson, Deputy Attorneys General for Plaintiff and Respondent.

Jose Antonio Jimenez led peace officers on a high-speed chase with his four- and six-year-old daughters in the car.  At one point during the pursuit, he drove straight toward a patrol vehicle in an apparent game of chicken.  The deputies were forced to veer

out of the way at the last moment to avoid collision. After a jury trial, the court sentenced Jimenez to a total term of 13 years, four months. On appeal, Jimenez contends the prosecution's failure to disclose a purportedly exculpatory police report violates *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), and the trial court's denial of his motion for a new trial based on that newly discovered evidence was reversible error. He also contends the imposition of separate punishments for the counts of assault and evasion of a peace officer violates Penal Code section 654.[1] We reject these claims but conclude Jimenez is entitled to remand for resentencing to allow the trial court to exercise its discretion to determine whether to strike the five-year enhancement imposed under sections 667, subdivision (a)(1) and 1385, which were amended after Jimenez's sentencing, effective January 1, 2019. In all other respects, we affirm.

## BACKGROUND

A. *Charges*

Jimenez was charged with assault with a deadly weapon on a peace officer (count 1, Pen. Code, § 245, subd. (c)), two counts of felony child abuse (counts 2, 3; Pen. Code, § 273a, subd (a)), and evading a peace officer with reckless driving (count 4, Veh. Code, § 2800.2, subd. (a)). The information alleged he had two prison prior convictions (Pen. Code, §§ 667.5, subd. (b), 668), one prior serious felony conviction (Pen. Code, §§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and one prior strike conviction (Pen. Code, §§ 667, subd. (b)-(i), 668, 1170.12).

---

[1] Unless otherwise specified, further statutory citations are to the Penal Code.

B. *Jury Trial*

A total of four deputies of the Fallbrook station of the San Diego County Sheriff's Department were involved in the incident. Deputies F. and B. were in one vehicle, and Deputies P. and A. were in a second vehicle. At the time of the incident, Deputy A. was Deputy P.'s training officer and remained his training officer for a total duration of approximately two weeks. At trial, the prosecution elicited testimony from three of the deputies.[2]

On March 22, 2017, Deputies F. and B. were driving a marked patrol car and recognized Jimenez, who had an active felony no bail warrant for his arrest for a probation violation. The deputies activated the patrol car's lights and sirens and attempted to conduct a traffic stop. Although Jimenez initially pulled into a parking lot, he did not stop; instead, he pulled into traffic on a busy street without yielding, causing another car to brake suddenly to avoid collision. He led the deputies on a high-speed pursuit, accelerating to 50 and 55 miles per hour on streets with speed limits of 25 and 35 miles per hour, speeding through numerous intersections and stop signs without slowing or stopping, again requiring another vehicle to slam its brakes to avoid a collision. At one point, he was speeding so fast that he was able to "catch air" after coming to a dip in the road.

---

[2]  Deputy B., who had been transferred from the Fallbrook station, did not testify at trial.

3

A second patrol vehicle, a marked SUV driven by Deputy P., attempted to assist during the pursuit but was unable to catch up. Deputy A. was a passenger in that second patrol vehicle. Deputy P. was able to see the vehicles driven by Jimenez and Deputy F. for about one-third to one-half of the pursuit, but then lost sight of them. He took an alternate route and tried to rejoin the pursuit based on information received from dispatch regarding Jimenez's location. As Deputy P. was traveling with lights and sirens activated, he saw Jimenez turn a corner and approach the SUV from the opposite direction. Although there was room for two vehicles to travel down the street without colliding, Jimenez drove into the opposing lane of traffic where the patrol SUV was driving. All three testifying deputies opined that Jimenez was driving approximately 40 miles per hour when his vehicle approached the SUV. The SUV had to swerve out of the way at the last moment to avoid a head-on collision. Deputy P. testified that they were three to four feet apart when he made this maneuver, whereas Deputy A. said they were about five to six feet away.

Eventually, Jimenez stopped abruptly in front of an apartment building. With no time to stop completely, the pursuing patrol car driven by Deputy F. collided with Jimenez's vehicle. Jimenez fled his vehicle but then turned after taking about 15 steps and informed deputies that his children were in the car. His daughters, ages four and six, were found in the front seat. There were no boosters or child seats in the vehicle. Deputies P. and A. spoke with the girls, who appeared upset. Both girls said they were scared.

4

Deputies found an open can of beer in the front center console area, about three-quarters full, and two other unopened cans of beer in the back seats. The prosecution introduced photographs depicting damage to the front of the patrol car and the rear bumper of Jimenez's vehicle sustained in the collision at the end of the pursuit. The photographs depicted dirt and mud on the patrol car that deputies testified was deposited during the pursuit when they followed Jimenez's vehicle through a large mud puddle.

In closing arguments to the jury, Jimenez's counsel emphasized that the only witnesses who testified at trial were the three deputies. Counsel questioned their credibility because they were the only witnesses to the charged offenses and were also victims in the charged evasion and assault. Counsel suggested the deputies' testimony was coordinated because of the similarities in their descriptions, and that they were biased because they "are all invested in the case. They are claiming that they are not just witnesses but a victim to an assault."

After an hour of deliberation, the jury returned guilty verdicts on all counts.

C. *Postverdict Proceedings*

At the sentencing hearing, Jimenez admitted he had two prison priors (§ 667.5, subd. (b)), one prior serious felony conviction (§§ 667, subd. (a)(1), 1192.7, subd. (c)), and one prior strike conviction (§§ 667, subd. (b)-(i), 1170.12).

Jimenez filed a motion to dismiss the strike allegation under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*). At the hearing, the trial court invited the parties to provide supplemental briefing addressing, among other things, whether

5

Jimenez had severed the gang ties that were apparent from his prior convictions.[3]  In response, the prosecution submitted a previously undisclosed police report authored by Deputy A. documenting a potentially gang-related shooting incident that occurred just weeks before the evasion incident.  The police report, which was sealed by the trial court, identified Jimenez as a documented gang member wanted on a probation violation and described video surveillance footage depicting Jimenez's presence when the shooting incident occurred.  The report indicated there was probable cause to arrest another individual involved in the shooting, but did not indicate there was probable cause for Jimenez's arrest in connection with the shooting.  There is no indication in the police report that anyone was injured in the shooting.  As the People explained in their supplemental sentencing brief:  "On February 10, 2017, [Jimenez] was present at a shootout between two known VFL gang members.  After the shootout, he got into a car and left with one of them.  Although he was not charged in [that] case, he clearly is demonstrating that he has not left the gang lifestyle behind."

In response, Jimenez sought a continuance to file a new trial motion, arguing that "the last minute submission . . . of a prejudicial, completely unreliable, police report . . . noting Mr. Jimenez was allegedly present at a shooting with gang implications less than [six] weeks before the offenses occurred in the case pending sentencing, and authored by the same law enforcement officer [the prosecution] designated as their

---

3     Prior to trial, Jimenez had filed an unopposed motion in limine to exclude any reference to gangs.  That motion was granted.

6

'investigating officer' who sat through the entire trial, and who testified to all charges, raises grave constitutional concerns and necessitates a continuance to properly pursue a motion for new trial."[4]

Jimenez then filed a motion for a new trial under section 1181, subdivision (8), arguing the new evidence was "quintessential bias, interest, or other motive evidence":

> "The police report tends to disprove the truthfulness of Officer [A.'s] trial testimony because it directly impacts his 'credibility or believability' which jurors 'must judge.' [Citations.] CALCRIM [No.] 226 instructs jurors when 'evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.' Jurors 'may consider' among other facts 'whether a witness's testimony was influenced by bias or prejudice . . . or a personal interest in how the case is decided.' [Citation.]

> "Officer [A.'s] February 14, 2017 report indicates that he knows who Mr. Jimenez is but has no probable cause to arrest [him] for the incident. The reasonable inference that any juror could have easily made is that if the officer could not arrest Mr. Jimenez for the February incident[,] he would want to make sure that Mr. Jimenez is convicted for the March charges."

Jimenez further argued the new evidence would render a different result probable on retrial: "If the jurors had known that the officers were unable to 'get' Mr. Jimenez for the February incident, it is probable that at least one juror would have voted not guilty." Finally, he argued a new trial was warranted because the evidence constituted exculpatory *Brady* evidence and the prosecution's failure to disclose it earlier violated his constitutional right to a fair trial.

---

4    Deputy A. was designated as the prosecution's investigating officer for purposes of trial during a pretrial motions hearing.

The prosecution opposed Jimenez's motion for new trial, arguing the police report was not *Brady* material because it was neither material nor exculpatory and further arguing Jimenez did not meet his burden warranting a new trial because he did not establish it was probable that at least one juror would have voted to find him not guilty had the new evidence been presented. The police report involved an unrelated, uncharged incident and did not reasonably give rise to an inference of bias on the part of the investigating officer.

The court denied Jimenez's motion for a new trial, concluding that the new evidence was immaterial and irrelevant:

> "The defendant in this case . . . has not met [his] burden . . . that it's probable that at least one juror would have voted to find him not guilty had a police report been turned over of a prior unrelated investigation done by the detective involved in the case.

> "The prior police report is not material or relevant to the current case where the defendant had two children unrestrained in his car when he took police on the high[-]speed chase. The fact that the detective from the uncharged case was a passenger in the second police car in the pursuit does not give rise to any new material evidence.

> ". . . . Evidence which simply creates a conflict with the prima facie case made out by the prosecution, rather than contradicting the strongest evidence against the defendant, does not support a new trial motion."

The trial court also denied Jimenez's *Romero* motion, noting that it was "a tough issue," but that, "based on the totality of the circumstances, it would be inappropriate to strike the prior" for the purposes of sentencing. The court then sentenced Jimenez to a total term of 13 years, four months, which included a consecutive five-year term for the prior serious felony conviction.

8

DISCUSSION

A. *Jimenez Has Not Established a* Brady *Violation*

Jimenez argues that the prosecution's failure to disclose the police report constitutes a *Brady* violation that resulted in an unfair trial in violation of his constitutional rights. We conclude Jimenez has not established a *Brady* violation because he has not shown the undisclosed police report was favorable or material to his case.

1. *Legal Principles*

A criminal defendant has a due process right to pretrial discovery of information favorable to his defense. (*Brady*, *supra*, 373 U.S. at p. 87.) The government has a constitutional duty to disclose both exculpatory evidence that casts doubt on the defendant's guilt and impeaching evidence that calls into question the credibility of government witnesses. (*Strickler v. Greene* (1999) 527 U.S. 263, 280-282 (*Strickler*); *People v. Williams* (2013) 58 Cal.4th 197, 256 [evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness]; *People v. Salazar* (2005) 35 Cal.4th 1031, 1048 (*Salazar*) [the prosecution's obligation under *Brady* extends to impeachment evidence]; *In re Pratt* (1999) 69 Cal.App.4th 1294, 1312 [duty to disclose evidence favorable to defendant extends to evidence reflecting on credibility of witness].)

The *Brady* rule extends to "evidence 'known only to police investigators and not to the prosecutor.' " (*Strickler*, *supra*, 527 U.S. at pp. 280-281.) " '[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.' " (*Id*. at p. 281; *Kyles v. Whitley*

9

(1995) 514 U.S. 419, 437 (*Kyles*).)  The prosecutor's duty to disclose is ongoing; "information that may be deemed immaterial upon original examination may become important as the proceedings progress . . . ."  (*Pennsylvania v. Richie* (1987) 480 U.S. 39, 60.)

"There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  (*Strickler*, *supra*, 527 U.S. at pp. 281-282.) "Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.'  [Citations.]  Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation].  A defendant instead 'must show a "reasonable probability of a different result." ' "  (*Salazar*, *supra*, 35 Cal.4th at p. 1043.)  "The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court."  (*In re Sassounian* (1995) 9 Cal.4th 535, 544 (*Sassounian*).)

On appeal, the defendant bears the burden to establish the components of a *Brady* violation.  (*Strickler*, *supra*, 527 U.S. at pp. 289, 291.)  We independently review whether such a violation occurred but give "great weight to any trial court findings of fact that are supported by substantial evidence."  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)

10

2. *Analysis*

Jimenez contends the failure to disclose, prior to trial, the police report authored by Deputy A. detailing a shooting incident that occurred weeks before the charged incident constitutes a *Brady* violation and deprived him of a fair trial. We assess each of the three components of a *Brady* violation, starting first with the issue of suppression.

a. *Suppression of Evidence*

It is undisputed that the suppression component of *Brady* is met. The Attorney General acknowledges "this report was in [the] prosecution's possession at the time of trial because it was in the possession of law enforcement, even though the prosecutor was not aware of the report until sentencing." Because suppression occurs when the government withholds evidence either willfully or inadvertently (*Strickler*, *supra*, 527 U.S. at pp. 281-282), the report was suppressed within the meaning of *Brady*.

b. *Favorable Evidence*

Jimenez argues the report is favorable to him because it could have been used to impeach Deputy A., to "show prior police bias against" Jimenez, and to attack the "good faith" of the police investigation in the charged incident. Jimenez claims the report constitutes "affirmative evidence of a police motive to coordinate and distort their testimony to gain a conviction" and constitutes evidence of bias of a complaining witness under *People v. Uribe* (2008) 162 Cal.App.4th 1457 (*Uribe*); *Sassounian*, *supra*, 9 Cal.4th 535; and *U.S. v. Bagley* (1985) 473 U.S. 667 (*Bagley*).

The Attorney General disagrees, arguing that the report is not impeachment evidence because it did not cast doubt on Deputy A.'s general veracity and could not have

11

been used to attack the good faith of the investigation because the mere fact that the deputy was aware of Jimenez due to his presence at a different offense is not enough to show that Deputy A. lied or had motive or opportunity to fabricate his testimony against Jimenez in the current trial.

The police report Jimenez claims is impeachment evidence is not like the evidence that was found to be discoverable as evidence of witness bias in the cases cited by Jimenez. *Uribe* involved the videotape of a medical examination performed on a child sexual assault victim. Defendant's expert declared the video undermined the photographic evidence from the same examination and the prosecution expert's conclusions regarding injury drawn therefrom. (*Uribe*, *supra*, 162 Cal.App.4th at p. 1470; see *id*. at p. 1482 [concluding reversal and a new trial were warranted due to *Brady* violation].) *Sassounian* involved a witness who had testified against the defendant but later recanted his testimony. (*Sassounian*, *supra*, 9 Cal.4th at p. 542; see *id*. at p. 550 [concluding defendant did not establish he could have obtained a different result even in the absence of the recanted testimony].) *Bagley* involved the government's failure to disclose contracts signed by principal witnesses involved in an undercover investigation of defendant, which contracts stated the government would pay money to the witnesses commensurate with the information furnished. (*Bagley*, *supra*, 473 U.S. at pp. 671, 683-684; see *id*. at p. 684 [remanding matter to appellate court for a determination whether there is a reasonable probability that, had the inducement offered by the government to the witnesses been disclosed to the defense, the result of the trial would have been different].)

In contrast, here, the police report relates to a different, uncharged and unrelated shooting incident. Although the report documents Jimenez's physical presence during the incident, it draws no conclusions regarding his involvement, if any, other than as a potential witness. The police report was authored by Deputy A., a testifying witness in the instant case, but there is no indication the report constitutes false reporting, nor is there independent evidence indicating Deputy A.'s dishonesty or embellishment of facts. (Cf. *Abbati v. Superior Court* (2003) 112 Cal.App.4th 39, 59 [evidence that established a " 'plausible factual foundation' " for allegations that a testifying officer was untruthful could be used to impeach that officer and was therefore favorable and material under *Brady*].) Given the collateral nature of the report and the absence of any plausible factual foundation for allegations of Deputy A.'s bias or untruthfulness, we are unconvinced the report had impeachment value under *Brady*.

Even if we were to assume Jimenez established the undisclosed report was favorable to his defense because of its impeachment value, we would reject his claim of error because, as we next discuss, the evidence was not material within the meaning of *Brady*.

### c. *Materiality/Prejudice*

Jimenez argues that, had the police report been disclosed prior to trial, he would have been able to convince at least one juror the police testimony was biased and not sufficiently credible to support conviction:

> "Appellant's only defense was to undermine confidence [in] the highly coordinated testimony of the police witnesses. The assault charges were entirely based on police testimony. There was no

13

video footage of the incident because Fallbrook Sheriff's department did not have dash-board cameras or body cameras for its officers. [Citation.] The police were the only victims of appellant's assault— appellant did not collide with anyone, or hit any property during the high speed chase. [Citation.] There were no other witnesses and no calls to 911 associated with the incident. [Citation.]

[¶] . . . [¶]

"In the context of this coordinated police testimony, the evidence of prior police investigation and bias against appellant because of a prior shooting incident was critical evidence corroborating appellant's theory the police were not telling the truth about what had happened, and were coordinating an embellished story in order to charge appellant with assault with a deadly weapon.

"Had the defense known of this prior incident it would have been able to more convincingly make the case for police bias. The police report could have been used during cross examination of [Deputy A.] to show that he was biased against appellant based on appellant's presence at a gang-related shooting."

The Attorney General responds that Jimenez's theory is "farfetched and speculative," and evidence in the case other than Deputy A.'s testimony, including the testimony of Deputies F. and P. and circumstantial evidence including photographs taken shortly after the pursuit ended, so strongly establishes the elements of the charged offenses that it is not reasonably probable the result would have been different had Jimenez used the police report to impeach Deputy A.'s testimony or otherwise bolster his defense. We agree with the Attorney General.

To establish materiality (and therefore prejudice), the defendant " 'must show a "reasonable probability of a different result." ' " (*Salazar*, *supra*, 35 Cal.4th at p. 1043.) "The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court. [Citations.] It is a

14

probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.] Further, it is a probability that is, as it were, 'objective,' based on an 'assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision,' and not dependent on the 'idiosyncrasies of the particular decisionmaker,' including the 'possibility of arbitrariness, whimsy, caprice, "nullification," and the like.' " (*Sassounian*, *supra*, 9 Cal.4th at p. 544.)

Under this standard, we conclude Jimenez has not met his burden to establish a reasonable probability of a different result. Jimenez claims he could have used the report to attack the thoroughness or good faith of the police investigation, to demonstrate police bias, and to undermine the credibility of Deputy A.'s testimony or to show he influenced the testimony of the other deputies. None of these arguments is convincing. Jimenez was not a suspect in a crime who had to be located or identified as part of any police investigation. His identity was never in question, particularly because he was never out of the lead officers' view and his two young daughters were sitting in his vehicle after he finally pulled over. Jimenez's theory of police bias is purely speculative. (See *People v. Hoyos* (2007) 41 Cal.4th 872, 922 (*Hoyos*), abrogated on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 641-642.) The mere fact that a deputy involved in the instant pursuit—in the second responding patrol unit—previously investigated an unrelated incident where Jimenez was present does not constitute evidence of police bias. Nor is there anything in the police report that diminishes the deputies' credibility. Jimenez's claims are so tenuous it is not reasonably probable that, had he used the police

15

report at trial—whether to undermine the police investigation, impeach Deputy A.'s testimony, or bolster his claim of police bias—the result would have been different.[5] (*Sassounian*, *supra*, 9 Cal.4th at p. 543; *Salazar*, *supra*, 35 Cal.4th at p. 1043 [defendant " 'must show a "reasonable probability of a different result" ' "]).

Moreover, " '[i]n general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citations]. In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony." ' " (*Salazar*, *supra*, 35 Cal.4th at p. 1050.) Here, Deputy A.'s testimony was corroborated by the testimony of the other deputies involved in the incident and contemporaneous photographs. In light of this independent corroboration, it is not reasonably probable Jimenez's use of the report would have produced a more favorable outcome for him. Based on the totality of the circumstances, the undisclosed report cannot reasonably be said to "put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles*, *supra*, 514 U.S. at p. 435.)

In sum, we conclude Jimenez has failed to demonstrate the materiality and prejudice necessary to establish a *Brady* violation.

---

5      Jimenez claims he wanted to use the report to show Deputy A. was "biased against appellant based on appellant's presence at a gang-related shooting," but he previously argued gang references should not be introduced at trial. Jimenez does not try to reconcile these positions.

B. *The Court Did Not Abuse Its Discretion in Denying Jimenez's New Trial Motion*

Jimenez contends that the trial court's refusal to grant his motion for a new trial under section 1181 based on the newly disclosed police report constitutes an abuse of discretion. This claim fails for the same reason as his claim of *Brady* error—the evidence is immaterial to Jimenez's case.

1. *Legal Principles*

A new trial should be granted based on newly discovered evidence only if the evidence is "material to the defendant" and the defendant "could not, with reasonable diligence, have discovered and produced [the evidence] at the trial." (§ 1181, subd. (8).) The newly discovered evidence must " ' "be such as to render a different result probable on a retrial of the cause." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) "Critically, '[a] new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence' or to contradict a witness of the opposing party." (*People v. Hall* (2010) 187 Cal.App.4th 282, 299 [affirming denial of defendant's new trial motion where it was unlikely the jury, even had it received the new evidence, would have changed its determination of defendant's guilt]; see *People v. Shoals* (1992) 8 Cal.App.4th 475, 488 [new trial properly denied where new evidence did not contradict the strongest evidence introduced against the defendant and at best created a conflict with the prosecution's prima facie case].) "On appeal, a trial court's ruling on a motion for new trial is reviewed under a deferential abuse of discretion standard. [Citation.] Its ruling will not be disturbed unless defendant establishes 'a

17

"manifest and unmistakable abuse of discretion." ' " (*Hoyos*, *supra*, 41 Cal.4th at p. 917, fn. 27.)

2. *Analysis*

Jimenez argues that he met his burden to establish a different result is probable on retrial because it is reasonably likely that at least one juror would have found the police testimony unreliable because of bias. Although the trial court is required to independently weigh the evidence in ruling on a motion for new trial, "an appellate court will not modify or set aside the verdict if there is any substantial evidence to support it." (*People v. Serrato* (1973) 9 Cal.3d 753, 761, disapproved on other grounds in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1.) Here, the testimony of Deputies F. and P. constitutes substantial evidence to support the verdict independent of the testimony offered by Deputy A. For the reasons discussed in our *Brady* analysis, we conclude it is not reasonably probable Jimenez would obtain a more favorable result if the case were retried and he could use the report for impeachment.

C. *Section 654 Does Not Preclude Separate Punishment for Counts 1 and 4*

Jimenez contends his sentence for evading a peace officer with reckless driving (count 4) should be stayed under section 654 because it occurred during the same course of conduct as his assault on a peace officer (count 1) and he had a single intent—to evade the police to avoid arrest. We disagree.

1. *Legal Principles*

Section 654, subdivision (a), provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that

18

provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  "Section 654 precludes multiple punishments for a single act or indivisible course of conduct."  (*People v. Hester* (2000) 22 Cal.4th 290, 294; *People v. Tarris* (2009) 180 Cal.App.4th 612, 626.)  " ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." ' "  (*People v. Capistrano* (2014) 59 Cal.4th 830, 885 (*Capistrano*), overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

But even if a course of conduct is "directed to one objective," it may "give rise to multiple violations and punishment" if it is "divisible in time."  (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.)  "[A] course of conduct divisible in time, though directed to one objective, may give rise to multiple convictions and multiple punishment 'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.' "  (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717-718 (*Lopez*).)  Section 654's purpose is to ensure " ' "that a defendant's punishment will be commensurate with his culpability." ' "  (*Capistrano*, *supra*, 59 Cal.4th at p. 886.)

Whether a defendant had multiple intents or objectives in committing multiple crimes is generally a question of fact for the sentencing court.  (*People v. Coleman*

19

(1989) 48 Cal.3d 112, 162.) "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) Such findings will be upheld on appeal if supported by substantial evidence. (*Ibid.*)

### 2. *Analysis*

Jimenez contends he harbored the same intent and objective during both the evading and the assault. He explains that "the objective of the assault was to evade the officers and prevent apprehension," and that the assault merely took the form of a "driving maneuver" during the same course of reckless driving. The Attorney General argues Jimenez "harbored multiple criminal objectives when he nearly crashed his vehicle into Deputy [P.'s] patrol car," noting the assault "occurred after an intense police chase, during which appellant reasonably could have developed animosity and anger toward the police." The Attorney General further contends it is reasonable to conclude Jimenez "harbored a separate criminal objective (assaulting the deputy) that was not merely incidental to his objective of fleeing from police."

Although both arguments are reasonable, we review the record to determine if there is substantial evidence to support the trial court's implied finding that Jimenez harbored multiple criminal objectives when he nearly crashed into the second patrol vehicle. We conclude the evidence was sufficient here. For the evading charge, Jimenez had to willfully flee from or try to elude an officer, with the intent to evade the officer. (Veh. Code, § 2800.2, CALCRIM No. 2181.) For assault, Jimenez had to willfully direct

20

his vehicle in a manner that would directly and probably result in the application of force likely to produce great bodily injury. (Pen. Code, § 245, subd. (c); CALCRIM No. 860.) Jimenez contends his primary objective was to avoid apprehension, but there is sufficient evidence to support a contrary finding that he harbored multiple objectives. He was being pursued by Deputy F. when he tried to evade capture by reckless driving (e.g., speeding and failing to stop at intersections). He then turned a corner and faced a separate vehicle, driven by Deputy P., which had previously lost sight of Jimenez, taken a different route, and was trying to rejoin the pursuit. Deputy P. explained they were no further than halfway down the street when they saw Jimenez turn the corner approaching them head-on. Apart from evading the first vehicle, Jimenez drove on the wrong side of the road heading directly toward the second vehicle, resulting in the commission of the assault. The evidence was sufficient to support the court's implied finding that Jimenez had two objectives—he was both intending to evade and trying to assault the deputies in the second vehicle. (See *People v. Blake* (1998) 68 Cal.App.4th 509, 512 ["Where a defendant entertains multiple criminal objectives independent of and not merely incidental to each other, he may be punished for more than one crime even though the violations share common acts or are parts of an otherwise indivisible course of conduct."].)

The trial court also could reasonably have found that Jimenez had time to reflect before committing the assault. Jimenez could have driven on his side of the road or moved rather than driving head-on toward Deputy P.'s vehicle. He chose not to do so, aggravating the severity of the situation. Jimenez's initial efforts trying to evade the first

vehicle, and his subsequent assaultive conduct, "were volitional and calculated, and were separated by periods of time during which reflection was possible." (*People v. Trotter* (1992) 7 Cal.App.4th 363, 368 [§ 654 did not bar punishment for two shots occurring within one minute of each other; defendant had opportunity to reflect and consider his action before firing each shot].)

In sum, the evidence supports the trial court's implied finding that section 654 does not prohibit multiple punishments for the evading and assault charges.[6]

D. *Jimenez Is Entitled to Remand for Resentencing Under Amended Sections 667 and 1385*

Jimenez contends his case should be remanded for resentencing pursuant to sections 667 and 1385, as amended by Senate Bill No. 1393, which, effective January 1, 2019, allows the trial court to exercise discretion to strike a formerly mandatory five-year enhancement applicable to defendants who have suffered a prior serious felony conviction. (Stats. 2018, ch. 1013, §§ 1-2.) Jimenez contends, and the Attorney General concedes, the amendments apply because Jimenez's conviction is not yet final. (See *In re Estrada* (1965) 63 Cal.2d 740, 744; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973.) We agree and therefore remand for resentencing under sections 667 and 1385. We express no opinion on how the trial court should exercise its discretion.

---

[6]     Jimenez also contends the trial court's failure to correctly apply section 654 violated his right to due process. Because we find no error in the trial court's application of section 654, defendant's due process claim fails.

DISPOSITION

Jimenez's sentence is vacated, and the matter is remanded to allow the trial court to determine whether to strike Jimenez's five-year enhancement under Penal Code sections 667, subdivision (a)(1) and 1385.  The judgment is affirmed in all other respects.


GUERRERO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.