Filed 12/22/21  P. v. Byrket CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID SCOTT BYRKET,<br><br>    Defendant and Appellant. | F079315<br><br>(Super. Ct. No. BF151624A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Susan M. Gill, Judge.

Patrick Morgan Ford for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In 2014, defendant David Scott Byrket was convicted by jury of one felony count of resisting an executive officer with force or violence, in violation of Penal Code section 69.[1]  The trial court suspended imposition of sentence and placed defendant on probation for three years, with the first 120 days to be served in jail as a condition of probation.

In defendant's first appeal, he claimed the trial court erred in admitting evidence that the internal affairs investigation into Deputy Geherty's use of force did not result in any disciplinary consequences.[2]  Defendant also claimed the trial court's instruction to the jury on that issue was erroneous and, cumulatively, the evidentiary and instructional errors deprived him of a fair trial.  Finally, in accordance with *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), defendant sought to discover statements from five percipient law enforcement witnesses and he claimed the trial court erred in withholding those statements.[3]

On review, this court found the trial court abused its discretion when it denied defendant's motion for discovery of the percipient witnesses' statements, and we conditionally reversed the judgment and remanded the matter for further proceedings.  However, we rejected defendant's other claims of error.

Following disclosure of the witnesses' internal affairs statements on remand, defendant moved for a new trial.  The trial court denied the motion and defendant's appeal of that ruling is now before us.  Defendant claims the court abused its discretion, entitling him to reversal of his conviction and remand for a new trial.

---

[1]  All further statutory references are to the Penal Code unless otherwise specified.

[2]  We take judicial notice of our prior nonpublished opinion in *People v. Byrket* (Oct. 11, 2017, F070942) 2017 Cal.App. Unpub. Lexis 6964 (*Byrket I*).  (Evid. Code, §§ 452, subd. (d), 459.)

[3]  A different judge presided over the jury trial than ruled on defendant's *Pitchess* motions.

The People dispute defendant's entitlement to relief.

We find no error and affirm the judgment.

## FACTUAL SUMMARY[4]

### I.      Prosecution Case

At the time of the offense, defendant lived in the Kern County town of Onyx with his wife, one of his adult sons and his daughter.[5]  On the morning of April 21, 2013, defendant's son, David, telephoned 911 and reported his father had "'lost his mind'" and was "'mentally not there.'"  David said defendant was "'running up and down the streets'" and "'yelling,'" was "'not himself,'" and "'need[ed] a psychiatric evaluation.'" (*Byrket I, supra*, 2017 Cal.App. Unpub. Lexis 6964, *3.)  David said his father had been that way for a few days.  While deputies with the Kern County Sheriff's Department were en route to Onyx, a neighbor also made a 911 call and told the dispatcher defendant is "'kind of a big, scary guy but he's [Welfare and Institutions Code section ]5150.'"  The neighbor said, "'[T]ry not to hurt him, okay, because he's a nice guy.  He's just out of it today.'" (*Ibid.*)

Kern County Sheriff's Deputies Geherty, Garza and Brooks responded to defendant's residence in separate patrol cars to conduct a welfare check.  Upon arrival, Geherty made contact with David while Garza made contact with defendant.  Garza testified defendant was running in the road in a zigzag pattern and jumped on a fence, and he was yelling about his daughter being raped and wanting to go to jail.  Defendant was described as alternating between calm and agitation.  Defendant voluntarily entered Garza's patrol car and was agreeable to going to Mary K. Shell, a mental health crisis center in Bakersfield.

---

[4]      The factual summary is taken from *Byrket I*.

[5]      Defendant's two sons and his wife testified at trial, and all share the same last name.  We refer to defendant's sons and his wife by first name to avoid confusion.  No disrespect is intended.

The 911 call was assigned to Geherty and, therefore, defendant was transferred to Geherty's patrol car for voluntary transportation to Mary K. Shell. Approximately 10 minutes into the transport, Geherty noticed defendant was slipping his handcuffs from the back of his body to the front of his body. Defendant did not comply with orders to stop and Geherty pulled his patrol car over near the entrance to Red's Marina at Lake Isabella. Defendant unbuckled his seatbelt and began kicking the window of the patrol car. After Geherty threatened to spray him with pepper spray if he did not stop, defendant represented he would stop, rolled over onto his stomach and placed his hands behind his head in compliance with Geherty's order. As Geherty went to open the passenger door, defendant kicked it open and used his body to prevent Geherty from closing it again.

Defendant and Geherty ended up struggling on the ground as Geherty attempted to regain control over defendant and get his hands cuffed behind his back again. Geherty had already placed two radio calls, the first to report defendant slipped his cuffs and the second to report defendant was resisting arrest. While Geherty was on the ground struggling with defendant but before responding officers arrived, citizen Carol Y. witnessed the struggle and pulled her vehicle over. She approached and offered her assistance but Geherty waved her off, concerned she would get hurt. She stood nearby and watched until other officers arrived. She then left the scene, but returned with her father and provided a statement to an officer.

In response to Geherty's radio call for assistance, four deputies, including Garza and Brooks, and two Kern County Parks and Recreation Department officers responded to the scene.[6] Officers succeeded in gaining control over defendant, handcuffing him

---

[6] The six responding officers were Senior Kern County Sheriff's Department Deputies Garza and Brooks, Reserve Kern County Sheriff's Department Deputies Melby and Kirkham, and Officer Armstrong and Park Ranger Eades with the Kern County Parks and Recreation Department.

behind his back again and hobbling his legs. Defendant was then returned to Geherty's patrol car and transported to jail.

## II. Defense Case

Defendant's wife, Zina, testified that defendant had no history of mental illness and was not violent. She said they had been arguing the morning of the incident because defendant wanted to kick David out of the house. She was upset and left. However, in a recorded telephone call defendant placed from the jail the day after his arrest, he told Zina he messed up and did not know why he was there. Zina responded that he needed mental help and had been crazy for the past few weeks. In a second recorded telephone call the same day, Zina told defendant he was going insane.

David testified that he had problems with alcohol on and off, and the day before the incident, he was at a wedding where he drank. He came home early the next morning and went to bed, but defendant woke him up and wanted him to do yardwork. They argued and defendant told him to pack his bags. David testified that in an effort to get defendant picked up and taken away, he called 911 and lied about defendant's behavior. He also testified he lied to his neighbor, his mother, and his brother, Jonathan, about defendant's behavior; and his neighbor called 911 at his request. David testified he did not tell his mother and brother the truth about the situation until two or three days later.

The defense also presented evidence that during the second telephone call defendant made from jail, he told Jonathan he needed to go to the hospital and had broken bones. After his release from jail, Zina took some photographs of bruises and marks on defendant's body. Zina testified the photos were taken at the same time, with the exception of the photo of his side. Additionally, she was unsure when she took the photo of his hand. However, during cross-examination, the prosecutor elicited evidence that of the photos Zina testified were taken at the same time, defendant was not wearing the same clothing in every shot.

Defendant's primary care physician testified that he saw defendant on April 29, 2013, for rib and chest pain, and subsequent evaluation revealed recently fractured ribs and a spinal compression. He defined "'recent'" for purposes of the fractures as sustained within days or a few weeks of the X-ray and testified that defendant has a history of severe osteoporosis, which renders sufferers more susceptible to fractures. (*Byrket I, supra*, 2017 Cal.App. Unpub. Lexis 6964, *7.) He also testified that he saw defendant eight days after the arrest and, while bruises start to turn yellow and green within two or three days of injury, defendant's bruising appeared fresh.

## DISCUSSION

### I. Remand in *Byrket I*

This appeal requires us to determine whether the trial court erred when it concluded defendant was not entitled to a new trial based on the posttrial disclosure of the statements Geherty, Garza, Brooks, Melby, and Kirkham provided during the internal affairs investigation into defendant's excessive force complaint. As a threshold matter, we address defendant's characterization of the disposition in *Byrket I* as "essentially" granting him a new trial if he could show the previously undisclosed reports were material.

Defendant advanced a similar argument in the trial court. The court disagreed and stated, "You say you felt the Court of Appeals' decision, essentially, found a prima facie basis for prejudice. If that were the case, I think they would have remanded the matter to have a new trial, and that's not what they did. They did a conditional reversal and said you need to get the information. You need to evaluate the information to decide if there's a basis for motion for a new trial. Then you can bring a motion for new trial. [¶] So I don't know that I agree that the appellate decision found a prima facie basis for prejudice, and I would invite you to show me where that is in the opinion."

Trial counsel then conceded, "You're right. I overstated my case."

6.

The argument fares no better on review. In *Byrket I*, we concluded, "Defendant is entitled to conditional reversal and remand for further proceedings. [Citation.] If, after disclosure of the statements, defendant elects to move for a new trial, he will be required to demonstrate a reasonable probability the outcome would have been different had the information been disclosed." (*Byrket I, supra*, 2017 Cal.App. Unpub. Lexis 6964, *33.) We then conditionally reversed the judgment, ordered the trial court to disclose the internal affairs statements and allow defendant a reasonable time to investigate, and stated, "If defendant can demonstrate he was prejudiced by the denial of this discovery, the trial court must order a new trial." (*Ibid.*)

A finding of materiality for the purpose of discovery does not equate to a finding of prejudice. (*People v. Gaines* (2009) 46 Cal.4th 172, 183.) "'California's *Pitchess* discovery scheme entitles a defendant to information that will "facilitate the ascertainment of the facts" at trial [citation], that is, "all information pertinent to the defense."'" (*Ibid.*) A "determination that information in the requested records ought to have been disclosed is not equivalent to a finding that such information would have had any effect on the outcome of the underlying court proceeding—nor, indeed, even to a finding that such information would have been admissible, inasmuch as the trial court's duty to disclose encompasses information that is not itself admissible but which 'may lead to admissible evidence.' [Citation.] To obtain relief, then, a defendant who has established that the trial court erred in denying *Pitchess* discovery must also demonstrate a reasonable probability of a different outcome had the evidence been disclosed." (*Id.* at p. 182.)

In this case, the trial court ordered disclosure of the material on remand, as directed, and trial counsel thereafter filed a motion for a new trial, as contemplated by our opinion. The trial court's ruling on that motion is now before us on review, and notwithstanding defendant's contrary assertion, we discern nothing unusual about this procedural posture.

## II.    Legal Standard

Postconviction, the trial court may grant a motion for a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial.  When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable."  (§ 1181, par. 8.)

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors:  '"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits."'"  (*People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*); accord, *People v. O'Malley* (2016) 62 Cal.4th 944, 1016–1017; *People v. Howard* (2010) 51 Cal.4th 15, 43 (*Howard*).)  "In addition, 'the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable.'"  (*Delgado, supra*, at p. 329; accord, *Howard, supra*, at p. 43.)

"'[T]he trial court has broad discretion in ruling on a new trial motion …,' and its 'ruling will be disturbed only for clear abuse of that discretion.'  [Citation.]  In addition, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'"  (*People v. Verdugo* (2010) 50 Cal.4th 263, 308; accord, *People v. O'Malley, supra*, 62 Cal.4th at p. 1016; *Howard, supra*, 51 Cal.4th at pp. 42–43.)  "'"'[I]n determining whether there has been a proper

8.

exercise of discretion on such motion, each case must be judged from its own factual background."'" (*Delgado, supra*, 5 Cal.4th at p. 328; accord, *Howard, supra*, at p. 43.)

## III. Analysis

### A. Trial Court Did Not Misapprehend Applicable Legal Standard or Scope of Discretion

In the trial court, defendant based his new trial motion on asserted inconsistencies among all five internal affairs statements and testimony at trial. On appeal, defendant focuses on Geherty and what he describes as "inconsistent facts that can only be considered lies."

In *Byrket I*, we rejected defendant's claim that the trial court erred in admitting evidence that Geherty faced no disciplinary consequences following the internal affairs investigation and we also concluded that even if we assumed error, it was harmless, stating, "This was a strong prosecution case and the defense was largely reliant on the difficult task of attempting to undermine the credibility of law enforcement witnesses." (*Byrket I, supra*, 2017 Cal.App. Unpub. Lexis 6964, *21.) The trial court noted the comment about the strength of the evidence when it denied defendant's new trial motion, and defendant now claims the trial court denied his motion largely because of this court's assessment of the evidence, which occurred "without access to the undisclosed reports and restrained by the applicable standard of review." Defendant argues that "the trial court erred by delegating the decision on the weight of the evidence to this Court, and it is for the trial court to determine the strength of the evidence."

We disagree with defendant's characterization of the ruling. The same judge who presided over the jury trial ruled on defendant's new trial motion and she was, therefore, very well positioned to evaluate the new material and consider defendant's arguments in determining the probability of a different result on retrial. (*Delgado, supra*, 5 Cal.4th at p. 328.)

9.

Moreover, the judge issued a thorough, six-page written ruling reflecting that she considered all the arguments, read the internal affairs statements, compared those statements to the trial testimony and concluded there was no reasonable probability of a different outcome had the statements been produced prior to trial. Unlike in *People v. Robarge*, cited by defendant, the record simply does not support his claim that the judge failed to discharge her duty under the law in ruling on his new trial motion and instead based her ruling on this court's comment in *Byrket I* about the strength of the evidence. (*People v. Robarge* (1953) 41 Cal.2d 628, 634 [reversal and remand required where record reflected trial court felt bound by jury's verdict and "failed to give [the] defendant the benefit of its independent conclusion as to the sufficiency of credible evidence to support the verdict"]; *People v. Watts* (2018) 22 Cal.App.5th 102, 115 [reversal and remand required where "the trial court did not articulate the correct standard of review, failed to act as a 13th juror to review and independently evaluate the evidence, and failed to give [the defendant] the benefit of its independent assessment regarding the sufficiency of credible evidence to support the verdicts"].) We now consider whether the trial court's ruling was otherwise an abuse of discretion.

**B.      Trial Court Did Not Err in Evaluation of Newly Discovered Evidence**

Section 69 can be violated in two ways. (*People v. Smith* (2013) 57 Cal.4th 232, 240, citing *In re Manuel G.* (1997) 16 Cal.4th 805, 814.) "'The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty.'" (*People v. Smith, supra*, at p. 240, quoting *In re Manuel G., supra*, at p. 814.) As we explained in *Byrket I*, defendant's conviction for resisting Geherty with force or violence under section 69 required the jury to find, in relevant part, that Geherty was acting lawfully at the time the offense was committed. (*People v. Smith, supra*, at pp. 240–241; *In re Manuel G., supra*, at p. 817.) An officer's use of excessive force renders an arrest unlawful, and that was defendant's theory at trial. (*People v. Southard*

10.

(2021) 62 Cal.App.5th 424, 434–435; *People v. Olguin* (1981) 119 Cal.App.3d 39, 44–46; *People v. White* (1980) 101 Cal.App.3d 161, 166–167.)  As such, the defense relied largely on attacking Geherty's credibility, with the hope the jury would doubt or reject his version of events.

However, "[n]ewly discovered evidence does not necessarily mean that false evidence was presented at trial."  (*In re Masters* (2019) 7 Cal.5th 1054, 1081.)  Further, generally, "'"[a] new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence" or to contradict a witness of the opposing party.'"  (*People v. Jimenez* (2019) 32 Cal.App.5th 409, 423, quoting *People v. Hall* (2010) 187 Cal.App.4th 282, 299; accord, *People v. Green* (1982) 130 Cal.App.3d 1, 11 ["As a general rule, 'evidence which merely impeaches a witness is not significant enough to make a different result probable .…'"]; see *People v. Ah Noon* (1897) 116 Cal. 656, 657–658 ["It would have to be a very exceptional showing that would move this court to order a new trial upon newly discovered evidence which would only serve the purpose of impeaching a witness .…"].)

Defendant's conviction was based on the events that occurred at the entrance to Red's Marina after Geherty saw defendant slipping his handcuffs in the patrol car during the transport.  Defendant relies on asserted factual inconsistencies regarding both the events in Onyx and the events at Red's Marina.  For clarity, we address the events in two parts, but we consider the overall effect of the new material in reaching the conclusion, as we do here, that the trial court did not err.

### 1.    Onyx

Regarding the events in Onyx, the trial court ruled, "There was some inconsistency among the witnesses as to whether the defendant was running or walking; climbing up on a wall or a fence, or whether he was merely attempting to climb up onto a wall or a fence; and the substance of his incoherent statements.  These inconsistencies among the recollections of the witnesses in their trial testimony were highlighted by the

11.

defense during the trial, and the slight differences in some aspects of the witnesses' internal affairs statements were not of such a material nature as to establish there would be a different outcome with a new trial."

In briefing on appeal, defendant points out, "Deputy Geherty testified at trial that *he witnessed* [defendant] jump onto a chain link fence, and then come down as Deputy Garza approached. [Citation.] However, in the Internal Affairs interview, Geherty said [*defendant*] *told him* that he had attempted to jump the fence, and cut his wrists in the process." He also points out that Geherty did not initially mention Brooks in his internal affairs statement, but, after watching Brooks testify at trial, his testimony tracked that of Brooks. In contrast, Garza, who did not watch Brooks testify, did not mention Brooks in his statement *or* during his testimony. Finally, defendant points to Garza's uncertainty in his statement concerning whether Geherty was transporting defendant to the crisis center voluntarily or on a Welfare and Institutions Code section 5150 hold versus his trial testimony that Geherty said defendant was willing to go to the crisis center.

As an initial matter, the events in defendant's underlying conviction occurred on the morning of April 21, 2013; Geherty, Garza, Brooks, Melby, and Kirkham were interviewed as part of the internal affairs investigation in February and March 2014; and the evidentiary phase of defendant's jury trial began at the end of October 2014. Human memory is imperfect, and some variation between a witness's statement and later trial testimony, or among multiple witnesses' statements and later trial testimony, is neither unusual nor unexpected. (See *People v. Verdugo, supra*, 50 Cal.4th at p. 311 [witnesses' memories naturally fade over time]; *People v. Swain* (1995) 33 Cal.App.4th 499, 504 [same].)

In this case, some of what defendant identifies as discrepancies are simply attributable to the questions asked during the investigation versus the questions asked during trial. For example, Geherty was asked during the internal affairs interview what he knew about defendant's bleeding wrists and he responded that defendant said he cut

12.

them jumping a chain link fence.[7]  During trial, Geherty was asked what he saw at the scene in Onyx, and he responded, in part, that while he was talking to defendant's son, he saw defendant jump up on a chain link fence.  These are answers to different questions, not factual conflicts between Geherty's versions of events.

Other discrepancies appear to be nothing more than natural variations that are expected when someone relates past events more than one time.  There was no dispute that Brooks, Geherty, and Garza arrived separately at the scene in Onyx, or that Geherty was transporting defendant to the crisis center when the events giving rise to the criminal charge occurred.  Despite defendant's representation to the contrary, Geherty and Garza both mentioned Brooks was present on the scene in Onyx during their internal affairs statements, and the slightly differing descriptions of the events that transpired there, including what each of the deputies did or saw and whether defendant was going to the crisis center voluntarily or pursuant to a Welfare and Institutions Code section 5150 hold, were minor.

At best, trial counsel might have asked additional questions of the witnesses but as impeachment material, these slight variations were of inconsequential value.  Defendant fails to show the trial court erred in so concluding.

### 2.    Red's Marina

Regarding the events at Red's Marina, the trial court ruled,

> "The altercation between the Defendant and Deputy Geherty at Red's Marina was precipitated by the Defendant slipping his handcuffs in the patrol car on the journey west on Highway 178 and kicking the inside of the patrol car.  When the other deputies and officers arrived, they saw Deputy Geherty wrestling to gain control of the Defendant outside of the patrol car.  The deputies assisted in gaining control of the Defendant and replacing him into the patrol car in a hobble restraint and handcuffs.  The testimony of the witnesses at trial clearly conveyed the chaos of the event, and the defense fully explored the differences in the testimony of the

---

**7**      There was evidence defendant was bleeding from his wrists at the scene in Onyx.

13.

witnesses to the event. The inconsistency in statements by the deputies to the internal affairs officer were not so materially different as to persuade the Court there would be a different outcome if the matter were tried again.

"The most persuasive argument of the defense is that Deputy Geherty never told the internal affairs officer that the Defendant kicked him in the groin, only that the Defendant attempted to kick him. (Motion for New Trial at p. 38, lines 10-23.) However, a review of the internal affairs statements by Deputy Geherty completely discredit this argument. Deputy Geherty did tell the internal affairs officer that the Defendant kicked him 'several times in the groin and lower leg area.' (Geherty IA at p. 16, line 9.) He added that the defendant attempted to kick him 'Approximately 10 times' and actually made contact with him 'Between 4 and 5 [times].' (Geherty IA at p. 16, line 10-13.)"

In briefing, defendant focuses on Geherty's asserted groin injury, which the trial court identified as his most persuasive argument facially, and on Geherty's baton use. Turning first to the groin injury, at trial, Geherty testified during direct examination that defendant kicked him in the right leg and groin area. The prosecutor then asked if defendant kicked him in the genitals and he answered yes. When the prosecutor asked Geherty to describe the pain from his injuries, he testified that the cuts to his leg did not bother him much, but he felt pain in his groin area. On cross-examination, Geherty responded affirmatively when trial counsel questioned him about whether he was kicked in his private parts, whether it "hurt like hell," and whether the injury "lasted the longest and hurt the most."

In his police report, however, Geherty documented that defendant *attempted* to kick him in the groin. Trial counsel questioned Geherty regarding this inconsistency at trial.

During the internal affairs investigation, Geherty mentioned being kicked in the groin, as the trial court found. Geherty stated that defendant attempted to kick him several times in the head and upper body but did not make contact. He also stated that defendant attempted to kick him in the lower body approximately ten times, and made contact with his groin and lower leg area between four and five times. When

14.

subsequently asked whether he sustained any injuries, Geherty responded that he sustained two minor lacerations to his right shin and knee, which he believed were from defendant kicking him, and a cut on his left hand from an unknown cause.

Trial counsel had the opportunity to impeach Geherty at trial with the inconsistencies in his police report and did so. Because Geherty's trial testimony that defendant kicked him in his leg and groin a few times was consistent with his statement to internal affairs, that aspect of his statement would have added nothing of value in terms of additional impeachment at trial.

Regarding his injuries, Geherty testified to the pain from being kicked in the groin after he was specifically asked about it by trial counsel. During the internal affairs investigation, Geherty was asked whether he sustained any injuries, but he was not asked about pain and he did not mention pain. However, Deputy Melby and Deputy Kirkham both related during their internal affairs interviews that they saw Geherty in pain at Red's Marina, which they thought was from a groin injury. Deputy Melby stated, "[A]t the end of the incident [Geherty] was slumped over … the trunk of the car and he was complaining of groin pain. I think he got struck in the groin." Deputy Kirkham stated, "[I]t seemed like the deputy that was transporting [defendant] that stopped and got him out of the car got kicked in the groin, because he was kind of bent over." Under these circumstances, the internal affairs statements would not have assisted the defense in impeaching Geherty's trial testimony concerning his groin injury in any meaningful way, and Melby's and Kirkham's statements would have instead bolstered Geherty's testimony he was kicked in the groan and it was painful.

Finally, as to Geherty's baton use, defendant argues Geherty "changed his testimony regarding his use of force in order to line up with [defendant's] documented injuries." Geherty testified he struck defendant with his baton in the right thigh area, just above the knee, and that he wedged his baton between defendant's right torso area and the road to get the leverage needed to force defendant over onto his stomach. In his

15.

internal affairs statement, Geherty initially said he believed he struck defendant on his leg below the knee, as defendant argues, but Geherty then said it could have been higher, on defendant's thigh. Geherty also stated during his interview that he had to use force to roll defendant over because defendant was resisting the entire time. Shown photographs of a linear bruise above defendant's right knee and a linear bruise on the right side of defendant's abdomen during his interview, Geherty said that the bruises were in the approximate location where he used his baton, which possibly caused the thigh bruise and, he believed, caused the abdominal bruise. We disagree that this evidence suggests Geherty was untruthful at trial or that Geherty's internal affairs statement would have resulted in any benefit of consequence to the defense in terms of impeachment.

As previously stated, a defendant is generally not entitled to a new trial where the only value of the newly discovered evidence is as impeachment evidence. (*People v. Jimenez, supra*, 32 Cal.App.5th at p. 423; *People v. Green, supra*, 130 Cal.App.3d at p. 11.) Here, review of the internal affairs statements belies some of defendant's claims that the new evidence would have been beneficial to impeach Geherty, and in those instances in which there might have been some arguable benefit, its value was minimal at best. Multiple witnesses testified to the struggle between Geherty and defendant at the entrance to Red's Marina, including a civilian witness who pulled over and offered to assist Geherty, and defendant fails to persuade us that the newly discovered evidence would have any measurable impact on a retrial.

Additionally, in urging that the trial court abused its discretion, defendant overstates the strength of his case. To that end, he asserts, among other things, that he had no history of mental illness, David lied about his behavior, and Geherty broke his ribs and fractured his spine during the struggle. However, the jail calls with defendant's wife speak to mental instability that preceded David's call to 911 by weeks; three deputies testified that defendant was behaving erratically in Onyx; testimony by defendant's wife that she photographed numerous injuries at the same time was

16.

undermined by the fact defendant was wearing different clothing in some of the photos; and defendant's doctor testified he has a condition that makes him susceptible to fractures, bruises start to turn yellow and green within two or three days of injury, and his bruises, eight days postarrest, appeared fresh.

In sum, the trial court was well positioned to evaluate defendant's motion, having presided over the jury trial; and the record reflects the trial court thoroughly reviewed defendant's claims. Following our review of the matter, we conclude that defendant failed to meet his burden of showing that the trial court abused its discretion when it found the internal affairs statements "would not have rendered a different result on retrial probable …." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 333.) Accordingly, we affirm the judgment.

## DISPOSITION

The judgment is affirmed.

MEEHAN, J.

WE CONCUR:

LEVY, Acting P. J.

FRANSON, J.

17.