Filed 2/18/21  P. v. Downey CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANGELO DOWNEY,<br><br>    Defendant and Appellant. | B296449<br><br>(Los Angeles County<br>Super. Ct. No. LA084851) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Jesic, Judge.  Affirmed

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Following his conviction on one count of forcible rape, Angelo Downey moved for a new trial pursuant to Penal Code section 1181, subdivision 6,[1] arguing the jury's verdict was contrary to law or evidence.  Downey also moved in the alternative to dismiss the case pursuant to section 1385.  The trial court denied both motions.  On appeal Downey argues, and the People concede, the trial court applied an incorrect legal standard when it denied the motion for a new trial.  Nonetheless, we agree with the Attorney General that the judgment of conviction is properly affirmed because the trial court's analysis in denying Downey's section 1385 motion establishes he suffered no actual prejudice as a result of the court's error.

**FACTUAL AND PROCEDURAL BACKGROUND**

An amended information charged Downey with the forcible rape of Liliana G. on October 26, 2014 in violation of section 261, subdivision (a)(2).[2]  Liliana, known as Lilly, and Downey both testified at trial, providing dramatically different accounts of their evening together.

1. *The People's Evidence*

Lilly and Downey met online in August 2014 when she was 19 years old.  They exchanged text messages and communicated with each other on social media sites.  Lilly agreed to meet

---

[1]    Statutory references are to this code.

[2]    Although the original information alleged only a single count of rape, the amended information alleged five separate counts of forcible rape on October 26, 2014, all identifying Liliana G. as the victim.  Downey moved to dismiss all five counts under section 1118.1 after the People rested.  The court denied the motion as to count 1, but granted the motion and dismissed counts 2 through 5.

2

Downey in October 2014 after Downey offered to help her prepare a resume and find a job.

The two met in person on October 26, 2014 after Lilly had spent the day working on a photoshoot with friends. Downey picked Lilly up from her aunt's house in South Central Los Angeles, where she was living. They played miniature golf in Sherman Oaks, stopped at a fast-food restaurant for Downey to get something to eat and then went to a nearby supermarket. Downey asked to drop off the groceries at his apartment, which was nearby in Studio City. Although Lilly had initially planned to wait in the car, when her phone battery died, she asked Downey if she could use a charger. Downey said he had one in his apartment, and Lilly and Downey went inside.

According to Lilly, a man wearing headphones was lying in the darkened living room when they entered the apartment. Lilly went to Downey's bedroom; sat on the bed, which was the only place to sit; and plugged in the phone charger. Downey asked if she wanted to watch Netflix. As they did, Downey started rubbing Lilly's thighs and "running his hands all over" her.[3] Lilly, who was wearing basketball shorts and a shirt-dress, told him to stop. Downey responded he was "just trying to have fun. He wasn't trying to have sex with [her] me that night." After pausing briefly, Downey again started touching her thighs, kissed her neck and grabbed her buttocks. Lilly again told him to stop, but Downey continued to touch her. Becoming more aggressive, Downey pinned her down with his lower body and,

---

[3] Lilly explained, "Honestly, I did not want to watch Netflix. I was just there to charge my phone [and] to get out. And he put on Netflix. And I was still on the bed. And that's when he started touching me."

holding her hands over her head, Downey touched her breasts and inserted his finger into Lilly's vagina.  He then pushed her shorts and underwear to the side and repeatedly inserted his penis into her vagina, ultimately ejaculating on her vaginal lips and thighs.  Lilly yelled, "No" throughout the assault.  Afterward, Downey went into the kitchen, and Lilly cleaned herself in the bathroom and left the apartment.

Lilly had left her purse in Downey's car when she went inside his apartment to use a charger.  When she returned to the car to retrieve the purse, it was locked.  Downey came out, "look[ing] very aggressive like if I didn't listen to him because he told me to get in the car.  And I just felt like if I didn't listen to him something was going to happen to me.  So I got in the car."  Downey drove Lilly home, insisting during the drive that "you can't call this rape."  Once back at her aunt's home, Lilly threw away her underwear because there was ejaculant on it.  After finishing charging her phone, she sent Downey a text asking if he had ejaculated inside her.  (Even though she had felt Downey ejaculate, she wanted confirmation because of her concern about pregnancy and disease.)  Downey did not respond.

Lilly explained she did not want to report the rape to the police because she had been raped as a child and the police had not helped her.  She did call her friend Megan Burnett and told her Downey had raped her.  Burnett took her to Planned Parenthood the following day.  A Planned Parenthood nurse notified the police of the assault.  That evening a police officer interviewed Lilly and took her to the Santa Monica UCLA Rape Treatment Center for examination.

Sharilyn Fields, a forensic medical examiner at the Rape Treatment Center, testified that Lilly's account of the incident on

the evening of October 27, 2014 was generally consistent with Lilly's testimony at trial, although she had said Downey only put the tip of his penis in her vagina briefly before ejaculating. Lilly told Fields that she had urinated after the attack and dabbed her vagina with water and wiped herself with a towel. Fields retained the shorts Lilly had been wearing during the attack and took swab samples from various places on her body.

Lilly also called the photographer, Donaven Thomas, the day after the assault and told him what had happened. She told him she had seen a nurse and had a rape kit done. Thomas said Lilly was upset and seeking support because she had no close friends in Los Angeles.

Los Angeles Police Detective Johneen Jones, the lead investigator, testified she had to make numerous attempts to contact Downey before he finally responded in November 2015. Interviewed at the police station,[4] Downey denied knowing Lilly and said he did not recognize her photograph. He also claimed he only dated Armenians, not Mexicans. Downey refused to provide an oral reference swab, but said he would return to do so. He did not keep that appointment. An oral swab was taken following Downey's arrest in December 2016.

Testimony from Los Angeles Police Department criminalists established there were three semen stains on Lilly's shorts. Samples from two of the stains matched Downey's DNA profile. The third sample did not contain sufficient genetic material to make a comparison. DNA from external genital swab samples and from the neck swab also matched Downey's DNA

---

[4] Detective Jones testified the interview was not recorded due to an equipment failure.

profile. No male DNA was detected in the vaginal swab. Male DNA was detected on the swab of Lilly's right hand (palm).

Fields explained an external genital swab goes on the outer labia and into the folds of the labia lips. Based on Lilly's description of the assault, Fields would expect to find semen on the external genital swab, but not the vaginal or cervical swabs. Asked whether, "[i]n the 7[00]-to-800 sexual assault exams you've conducted, have you ever found there to be sperm in the external genital swab from an over-the-clothing hand job conducted either by the defendant masturbating or the victim giving the defendant a hand job," Fields responded, "In my experience, no. I've never heard of anything or never seen anything like that."

2. *The Defense Evidence*

Downey testified in his defense. He described Lilly as wearing tight-fitting high-waisted shorts, fishnet stockings and an oversized jersey when they met on October 26, 2014. After playing miniature golf, they agreed to go to Downey's apartment to "'Netflix and chill.'"[5] Before arriving at the apartment they

---

[5] After defense counsel asked Downey, "Was there any conversation about what you were going to do other than play miniature golf," the following exchange took place:

"[Downey]: The term is, 'Netflix and chill.' So after golf we were going to Netflix and chill

"[Counsel]: What does chill —

"[Downey]: Watch.

"[Counsel]: I know what Netflix is. We're going to chill?

"[Downey]: Watch a show on Netflix and, like, the same setting and just relax.

"[¶] . . . [¶]

6

stopped for snacks at a supermarket and a fast-food restaurant where Downey got something to eat.

At Downey's apartment he and Lilly watched Netflix with Downey's cousin in the living room while Downey finished eating. Downey and Lilly then went into Downey's bedroom and continued watching Netflix while lying on the bed facing each other. Lilly unzipped her shorts. Downey held her buttocks underneath her clothing. Lilly told him she did not want to have intercourse on a first date, but they kissed and touched one another. Downey became aroused and pulled his erect penis from his jeans. Lilly stroked Downey's penis, and he ejaculated "on her lower half like the panty line." Asked to clarify, Downey said he had ejaculated on her skin, her body and parts of her panties. On cross-examination Downey testified Lilly's shorts and panties had been pulled down just past "the beginning" of her vagina. His penis was touching her panties when he ejaculated.

After he had ejaculated, Downey retrieved toilet tissue and wiped it off. Both of them then went into the bathroom and cleaned themselves with a washrag. Downey testified on direct examination that Lilly had used the washrag after he did, but on cross-examination acknowledged he had cleaned himself "when she was done with it."

Downey denied he had been shown a photograph of Lilly at the November 6, 2015 interview and did not recall saying he did

---

"[Counsel]: When you say, 'chill,' that process would be at a location other than the miniature golf, correct?

"[Downey]: Well, I wasn't going to go back to her aunt's house. And I had my own place. So the plan was to hang out at my apartment."

7

not know her. He had refused to give a DNA sample because he wanted to talk to a lawyer and his family first.[6]

Los Angeles Police Officer Hassel Montoya interviewed Lilly at the Rape Treatment Center in the early morning of October 28, 2014. Her report indicated Lilly was calm and even amused at times. Montoya commented Lilly's demeanor was perhaps due to nervousness, something she had observed with other rape victims. Montoya noted inconsistencies in Lilly's description of the assault. Lilly said Downey put two to three inches of his penis into her vagina four to five times, although she subsequently said he may have inserted his entire penis into her vagina one time but was not sure. Lilly told Downey to stop because she did not want to have sex. When she wiped herself afterward, she felt semen on her body. Lilly explained she was reluctant to notify the police of the rape because of her prior experience.

Ryan Mahome, Downey's cousin, testified he was staying at Downey's apartment on October 26, 2014. He was sitting in the living room watching television when Downey and Lilly came in. Downey introduced Lilly to him, and all three of them watched television while sitting on the couch. Downey and Lilly then

---

[6] On rebuttal Los Angeles Police Detective Josie Torres explained she had been present when Downey was interviewed on November 6, 2015 and confirmed the recording equipment had malfunctioned during the interview. Torres testified Downey denied knowing anyone named Lilly or Liliana or someone fitting Lilly's description. Torres believed Downey was shown a photograph of Lilly during the interview. Torres also testified that Downey did not say he wanted to speak to a lawyer, only that he wanted to talk to his family before providing a DNA sample.

8

went into the bedroom, leaving the door open. They were in the bedroom for 45 to 60 minutes. Mahome was not wearing headphones. He did not hear anyone scream. Mahome saw Downey and Lilly go into the bathroom together and leave the apartment together. Lilly was not crying.

Neda Fiset, the manager of the apartment complex where Downey lived, occupied the apartment directly beneath Downey's. According to Fiset, she could hear sounds from Downey's apartment such as people walking, chairs scraping and the television, but not conversations. She did not hear a woman yelling, "Stop" from Downey's apartment in late October 2014.

3. *Verdict and Posttrial Motions*

The jury convicted Downey of rape. Following the conviction Downey moved for a new trial pursuant to section 1181, subdivision 6, and, alternatively, to dismiss the case pursuant to section 1385.

Arguing at the hearing on the new trial motion, the prosecutor, Michele Pincus, asserted, "The relevant question is whether any trier of fact could have found the elements of the case beyond a reasonable doubt after reviewing the facts in the light most favorable to the prosecution. That's the law. That's what the law requires the court to review, as the court knows. And any rational fact finder would have found this. . . . It's not what the court believes. It's what a rational fact finder would find."

The trial court agreed with the prosecutor's view of its role in deciding the motion: "[T]he standard is, as Ms. Pincus stated, could a rational jury find the defendant guilty based on the facts in this case? No doubt in my mind that a jury could. A jury did. But there's no doubt in my mind that a jury could based on the

9

facts. The case came down to a credibility issue between the defendant and the victim. And so based on [section 1181, subdivision 6,] the motion is denied."

In denying the motion pursuant to section 1385, after observing that Lilly's and Downey's accounts of what had happened were in complete conflict and that each of them had credibility issues, the court stated, "So what we need to do is look at certain circumstantial evidence to determine what happened. . . . Part of the circumstantial evidence is the semen that's found on the victim. One interpretation is that the defendant ejaculated inside those shorts, and that's how the semen got on the vagina. The other interpretation is that somehow the semen got inside the pants during her masturbating him. . . ." "You're asking the court to tell you how it felt as a 13th juror, there's no way I can say that a reasonable juror couldn't come to the conclusion they did. . . . It is the decision that the jurors came up with. And I can't dispute that as a 13th juror. And I won't. Not based on the evidence I heard in this case. . . . [I]f you take out the victim's testimony and the defendant's testimony, you're still left with that DNA that's inside the shorts, that's on the vagina, actually inside the vagina. And it is almost impossible to explain how that happened. And I didn't hear a logical explanation, not from the defendant in this case as to how that happened. And for those reasons the motion is denied."[7]

---

[7]     After Downey's posttrial motions were denied, the court sentenced him to state prison for three years.

**DISCUSSION**

1. *Governing Law and Standard of Review*

Section 1181, subdivision 6, authorizes the trial court to grant a new trial "[w]hen the verdict or finding is contrary to law or evidence." When ruling on a motion pursuant to this provision, the trial court "extends no evidentiary deference . . . . Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' [Citations.] If the court is not convinced that the charges have been proven beyond a reasonable doubt, it may rule that the jury's verdict is 'contrary to [the] . . . evidence.' [Citations.] In doing so, the judge acts as a 13th juror who is a 'holdout' for acquittal." (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.)

We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108; *People v. Knoller* (2007) 41 Cal.4th 139, 156; *People v. Jimenez* (2019) 32 Cal.App.5th 409, 423.) An abuse of discretion is shown if the trial court based its decision on an incorrect legal standard. (*Knoller*, at p. 156; see *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733; *People v. Aguillera* (2020) 50 Cal.App.5th 894, 910; *Wade v. Superior Court* (2019) 33 Cal.App.5th 694, 709.)

The erroneous denial of a new trial motion is not a ground for reversal, however, unless the defendant suffered actual prejudice as a result. (See *People v. Braxton* (2004) 34 Cal.4th 798, 816-817 ["the constitutional provision—which precludes the reversal of a judgment or the granting of a new trial for a trial court error unless that error is determined to have resulted in a miscarriage of justice—applies to state law errors generally"];

11

see generally Cal. Const., art. VI, § 13 ["[n]o judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].)  As the Supreme Court explained in the context of a trial court's error in refusing to hear a defendant's new trial motion, "[A] judgment of conviction may not be reversed and a new trial may not be ordered for a trial court's failure to hear a new trial motion when a reviewing court has properly determined that the defendant suffered no prejudice as a result. This will occur when, for example, the record shows that the trial court would have denied the new trial motion and the reviewing court properly determines that the ruling would not have been an abuse of discretion, or the reviewing court properly determines as a matter of law that the motion lacked merit." (*Braxton*, at p. 818.)

    2. *Downey Has Failed To Demonstrate Prejudice from the Trial Court's Error*

Following the erroneous lead of the prosecutor, in denying Downey's motion for a new trial the trial court failed to exercise its independent judgment and determine whether the evidence supported a finding of guilt beyond a reasonable doubt, instead applying an objective substantial evidence test properly used for a motion for acquittal under section 1118.1 or by this court in considering on appeal whether the verdict is supported by sufficient evidence.  As Downey argues, and the Attorney General concedes, this was error.

However, when deciding Downey's alternative motion for dismissal under section 1385, the court performed the analysis it

12

should have used in ruling on the new trial motion—it acted as a 13th juror and stated its agreement with the jury's verdict. Accordingly, any error in employing the incorrect legal standard on the new trial motion was harmless.

Downey does not dispute that the court used the 13th juror standard in denying his section 1385 motion. Nonetheless, he advances two arguments to urge us to reverse his conviction and remand the matter for the trial court to reconsider his new trial motion. First, he contends the court's reasoning was based on its mistaken recollection of the state of the DNA evidence—no male DNA was found on the vaginal swab. Second, he insists the court erred by including in its evaluation Downey's failure to explain or rebut the DNA evidence, an error that infringed Downey's constitutional right not to testify. Neither argument has merit.

Contrary to Downey's suggestion, the trial court did not mistakenly believe Downey's DNA had been found on the vaginal swab, rather than on the external genital swab, but simply used imprecise terminology when discussing that evidence.[8] During argument on the new trial motion, the court expressly referred to this critical piece of evidence, "I can't remember the exact term that was used. But it was inside the vagina, the way they describe it and the way they described how the vagina is formed. That was—it sounds like it's on the outside but it's actually on the inside of the outer lip area of the vagina." The prosecutor confirmed, "The labia. Yes, Your Honor." And the court

_____

[8]     During argument on the new trial motion the prosecutor repeatedly referred to this DNA evidence as coming from an "external vaginal swab" and emphasized "the external vaginal swab was on the inside and outside of the victim's labia; therefore, inside her body, not somewhere on her leg."

13

responded, "The labia. That's my understanding what the testimony was." The court repeated its accurate understanding of the DNA evidence during argument on the section 1385 motion later the same day when responding to defense counsel's argument that Downey was entitled to an acquittal if the circumstantial evidence was reasonably interpreted as consistent with his version of the sexual episode: "I agree with you, in terms of the sperm being on the labia. If there's two reasonable interpretations of that evidence and one points to innocence, then I have to find it that way. I'm not sure there is."

It was this DNA evidence the court again referred to a short while later when explaining its denial of the section 1385 motion. The court concluded—as it would be entitled to acting as the 13th juror—that the defense theory of the case did not reasonably explain "that DNA that's inside the shorts, that's on the vagina, actually inside the vagina." There was no misunderstanding of the evidence introduced at trial.

The court's additional comment that it had not heard a logical explanation for that DNA evidence other than Lilly's account of the sexual assault, including from the defendant, did not improperly draw an adverse inference from Downey's silence in violation the of constitutional right not to testify. Downey testified. Indeed, he did so at some length concerning his interaction with Lilly on the evening of October 26, 2014, including testimony as to how he ejaculated; where his ejaculant went on Lilly's skin and clothes; and how Lilly and he cleaned themselves afterward. The court's evaluation of the consistency of that testimony with the DNA evidence, and therefore its reasonableness, was entirely proper. (Cf. *People v. Cortez* (2016) 63 Cal.4th 101, 117-118 [proper for court to instruct jury to apply

"'neutral standards of credibility'" to testifying defendants as set out in CALCRIM No. 226, which includes evaluating the reasonableness of the testimony in light of the other evidence in the case]; *People v. Gordon* (1982) 136 Cal.App.3d 519, 532-533 [prosecutor's comment in closing argument on defendant's testimony, suggesting it was deliberately deceptive, "is within the bounds of fair comment"].)

## DISPOSITION

The judgment is affirmed.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.