Filed 2/6/23  P. v. Hernandez CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS HERNANDEZ,<br><br>        Defendant and Appellant. | B322539<br><br>(Santa Clara Super. Ct. Case Nos. B1689200, C1886706)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING (NO CHANGE IN APPELLATE JUDGMENT) |

THE COURT:

It is ordered that the opinion filed herein on January 25, 2023 be modified as follows:

On page 6, the last sentence beginning with "Defense counsel argued" is deleted and replaced with the following sentence:

> Other witnesses testified the two vehicles had not been alongside each other, and defense counsel argued, based on that testimony and surveillance footage, no such conversation occurred.

There is no change in the appellate judgment.  Appellant's petition for rehearing is denied.

_____

PERLUSS, P. J.          SEGAL, J.          FEUER, J.

Filed 1/25/23  P. v. Hernandez CA2/7 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS HERNANDEZ,<br><br>    Defendant and Appellant. | B322539<br><br>(Santa Clara Super. Ct. Case Nos. B1689200, C1886706) |

APPEAL from a judgment of the Superior Court of Santa Clara County, Griffin Bonini, Judge.  Affirmed in part, reversed in part and remanded.

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, and David H. Rose, Deputy Attorney General, for Plaintiff and Respondent.

————————————

A jury convicted Carlos Hernandez on two counts of special-circumstance murder and other felonies with true findings on related criminal street gang and firearm-use enhancements. On appeal Hernandez contends the trial court erred in denying his request to instruct the jury with optional language on antecedent threats in CALCRIM No. 505 (self-defense as justifiable homicide) and CALCRIM No. 3470 (self-defense as defense to crime of shooting at inhabited dwelling) and erred in failing to add a similar pinpoint instruction to supplement CALCRIM No. 571 (imperfect self-defense). Hernandez also contends the court erred in denying his motion to declare a mistrial or, in the alternative, to strike the testimony of the coroner as a consequence for the People's failure under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) to produce impeachment evidence. In addition, relying on Assembly Bill No. 333 (Stats. 2021, ch. 699, § 3) (Assembly Bill 333), effective January 1, 2022, which significantly modified the procedural and substantive requirements for trying and proving gang enhancements, Hernandez asserts all his convictions must be reversed. At a minimum, he argues, his substantive conviction for active participation in a criminal street gang and the gang enhancements can no longer stand.

We reverse the conviction for active gang participation and the true findings on the gang enhancements and vacate Hernandez's sentence. On remand the court is to give the People an opportunity to retry the gang offense and/or gang enhancements under the law as amended by Assembly Bill 333. If the People elect not to retry Hernandez, or at the conclusion of retrial, the court is to resentence Hernandez consistent with all

recently enacted ameliorative legislation.  In all other respects we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Amended Information*

An amended information filed January 6, 2019 charged Hernandez with the murders of Arturo Ramirez and Michael Ramirez[1] (Pen. Code, § 187, subd. (a))[2] (counts 1 and 2), possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 3), active participation in a criminal street gang with intent to promote, further or assist the gang's felonious criminal conduct (§186.22, subd. (a)) (count 4) and shooting at an inhabited dwelling (§ 246) (count 5).

As to counts 1 and 2 the amended information specially alleged two special circumstances—intentionally discharging a firearm from a motor vehicle with intent to inflict death (§ 190.2, subd. (a)(21)) and committing multiple murders (§ 190.2, subd. (a)(3))—and a firearm enhancement (§ 12022.53, subd. (d)). As to all but count 4 the amended information specially alleged the offenses were committed to benefit a criminal street gang (§ 186.22, subd. (b)).[3]  As to count 3 it specially alleged

---

[1]     Because Arturo Ramirez and Michael Ramirez share the same surname, we refer to them by their first names for clarity.

[2]     Statutory references are to this code unless otherwise stated.

[3]     At times we employ the shorthand "to benefit a criminal street gang" to mean for the benefit of, at the direction of or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members. (See § 186.22, subd. (b)(1).)

Hernandez possessed a firearm (§ 12021, subd. (a)(1)), and as to count 5 that a principal had discharged a firearm causing death (§ 12022.53, subds. (d), (e)).  In addition, the amended information specially alleged Hernandez had suffered two prior convictions for serious felonies within the meaning of both section 667, subdivision (a), and the three strikes law (§§ 667, subds. (b)-(i), 1170.12).

Hernandez pleaded not guilty and denied the special allegations.

2. *The Evidence at Trial*

a. *The shooting*

Following an altercation between "Jake," a member of the Barrio Grande Tierra (BGT) gang, and "Elijah," a member of the Varrio Norteño Homeboys (VNH) gang, two subsets of the Norteño criminal street gang, members of the subsets held a meeting to discuss their response to the ongoing dispute.  They decided Jake and Elijah would resolve the matter with a one-on-one fight in the local park.  However, during a telephone call the next day, Arturo, a BGT shot-caller, told Peter Sanchez, a VNH shot-caller and Hernandez's cousin, the fight would not occur as planned.  Sanchez angrily responded, "If it happens again, we're going to be knocking on doors."

Christopher Ruby, Sanchez's stepson, was a witness for the prosecution after entering a negotiated plea.  Ruby testified he was with Sanchez during the call and understood Sanchez's words as making a "serious threat" to Arturo.  According to Ruby, Arturo replied, "Slide through," which Ruby understood to mean, "Come on over."

After this telephone call Sanchez and several VNH members, including Ruby, drove in Sanchez's sports utility

4

vehicle (SUV) to Arturo's home near the corner of 8th and Martha Streets. Hernandez, described at trial as an associate of VNH, followed them in his pickup truck. When Sanchez's group and Hernandez arrived at Arturo's home, they were met outside by Arturo, Michael and a large group of BGT gang members armed with baseball bats and guns. Sanchez and one of his passengers got out of the SUV. A shoving match ensued. Michael brandished a gun and waved it in the face of one of the passengers still in the SUV. Hernandez got out of his truck and brandished an AK-47 assault weapon with the barrel pointed toward the ground. At some point during the scuffle Arturo and Sanchez decided they should take the dispute to the park for a "one on one." The crowd began to disperse. Sanchez and his passenger got back in the SUV, and Hernandez returned to his truck.

After the group returned to their vehicles, witnesses heard several gunshots. Surveillance video footage showed gunfire flashes coming from Hernandez's truck. There was conflicting evidence at trial as to who fired first. Several witnesses, including Ruby, testified they had heard slower, softer gun shots first, followed by louder, quicker shots, suggesting BGT members had fired first and Hernandez had returned fire. At least one other witness testified she believed she had heard the automatic weapon first.

Ruby, calling Hernandez a "one-man army," testified that Hernandez was the only one in their group who had brought a gun. According to Ruby, after Hernandez and Sanchez returned to their vehicles but before any shots were fired, Hernandez pulled up alongside Sanchez and had a brief conversation. Sanchez told Hernandez they were taking the dispute to the

5

park.  Hernandez said, "Come on," let me "hit these fools." Sanchez said no.  When Hernandez asked again, Sanchez shrugged.  Hernandez then quickly turned his truck around and returned to the Ramirez house.  (Ruby testified Hernandez made a U-turn to return to the house although surveillance footage showed Hernandez briefly driving in reverse in the direction of the Ramirez house.)

After the initial shooting Hernandez sped north on 8th Street toward the SUV, which had remained on the corner of 8th Street and Martha Street.  Sanchez made a right on Martha and left the area.  Hernandez continued driving straight.  When Hernandez reached a dead-end, he made a U-turn and drove quickly past the Ramirez house again, spraying between 15 and 30 shots from his automatic weapon.  Arturo and Michael were killed by gunfire from the AK-47.

In testimony vigorously challenged by Hernandez's counsel, Ruby said, before returning to the Ramirez house for the last time, Hernandez once again pulled his truck alongside the SUV and told Sanchez he was "going back."  He had had his weapon "on semi" during the initial shooting and intended to put it on fully automatic.[4]  Defense counsel argued based on surveillance video footage that no such conversation occurred.

---

[4]     In his appellate briefs Hernandez's counsel referred to Hernandez making two trips to the Ramirez house, the first when he arrived and fired his weapon in response to BGT gunfire and the second after he had made his U-turn at the dead end and fired his weapon as he drove past.  At oral argument Hernandez's counsel characterized the events as involving three trips:  The initial arrival at the house; backing up (or reversing direction) and shooting his weapon in response to BGT gunfire; and

The People's theory at trial[5] was that no one was killed in the initial exchange of gunfire. Michael and Arturo were killed after Hernandez made his U-turn and returned to the house, firing his automatic weapon along the way.

The defense theory at trial was that BGT gang members fired the first shots, and Hernandez returned fire with his AK-47 in self-defense and sped away. When he came to a dead end, Hernandez turned his truck around and, knowing he would have to pass the house where people had just shot at him to return to his own home, he again fired his weapon in self-defense.

b. *The gang evidence*

The prosecution introduced evidence of four predicate offenses, each committed by a VNH gang member in 2011 or 2012. Detective Nader Yasin of the San Jose Police Department testified as a gang expert for the People. Based on a hypothetical scenario that closely tracked the People's evidence and theory of the case, Yasin testified the homicides were committed to benefit a criminal street gang.

---

returning to house after making a U-turn at the dead end. However the sequence is characterized, it is undisputed the events described occurred within minutes, if not seconds, of each other.

[5] Hernandez and Sanchez were tried jointly. Sanchez, charged with voluntary manslaughter, not murder, was acquitted.

3. *The Jury Instructions on Complete and Imperfect Self-defense*

The court instructed the jury with CALCRIM No. 505 (complete self-defense to homicide), CALCRIM No. 3470 (complete self-defense to shooting at an inhabited dwelling) and CALCRIM No. 571 (imperfect self-defense as a mitigated defense to murder). The court also instructed pursuant to CALCRIM No. 1403 that the jury could consider gang evidence for limited purposes, including in determining whether "[t]he defendant actually believed in the need to defend himself." The court denied Hernandez's requests to add optional (bracketed) material contained in CALCRIM No. 505 relating to a defendant's knowledge of antecedent threats as a factor in determining whether the defendant's conduct was reasonable, finding that the instructions, which allowed the jury to consider all the circumstances as they were known to and appeared to the defendant and evaluate what a reasonable person in a similar situation with similar knowledge would have believed, were a complete and adequate statement of the law based on the evidence presented without the additional language.

4. *Hernandez's Motion for Mistrial or To Exclude the Testimony of the Coroner*

Dr. Michelle Jorden, Santa Clara County's chief medical examiner, performed the autopsies of Michael and Arturo. On direct examination Dr. Jorden testified Michael had suffered a gunshot wound to the head and described a "top to bottom" bullet trajectory. Asked as part of a hypothetical question whether the mortal wound to the head "was consistent [with] a person that's maybe trying to duck for cover or trying to get on the ground," Dr. Jorden replied, over objection, "Yes." Asked whether the

8

nature of the wound "could that also be consistent with a person that's shooting a gun through a passenger's door and then hitting Michael Ramirez on the head as he's attempting to go down to the ground," Dr. Jorden responded, over objection, "Yes."

Dr. Jorden testified Arturo was shot twice, once in the buttocks with the bullet travelling through the left abdomen, the fatal wound, and once in his right hand. Asked whether Arturo's wounds were "consistent with, say, a bullet that goes through, say, a car that Mr. Arturo Ramirez was maybe hiding behind and then entering the back of the hand and existing out the palm," Dr. Jorden replied, over objection, "Yes."

While the jury deliberated, Hernandez's counsel alerted the court the defense had discovered two memoranda, one from 2012 and another from 2019, written by a Santa Clara County deputy district attorney. The memoranda, taken together, highlighted Dr. Jorden's opinions in two cases (in 2012 and 2019), both involving the death of a child. In each case the author of the memorandum wrote Dr. Jorden had become more advocate than pathologist, describing herself as "an advocate for victims." The defense moved for a mistrial or, in the alternative, to exclude Dr. Jorden's testimony, describing the material as impeachment evidence discoverable under *Brady*. The prosecutor stated he had not become aware of the memoranda until after Dr. Jorden testified. Although he discovered the existence of the memoranda before the close of evidence, he did not think it was particularly relevant in this case, in which cause of death was not an issue, let alone that it constituted *Brady* material. The court denied the motion, ruling there was no *Brady* violation and stating, in any event, it would have excluded the material under Evidence Code

section 352 if it had been produced and defense counsel sought to use it to impeach Dr. Jorden.

  5.  *The Verdict and Sentence*

The jury found Hernandez guilty on all counts and found the special circumstance, firearm enhancement and gang enhancement allegations true.

In a bifurcated proceeding the court denied Hernandez's motion to dismiss the prior conviction allegations under the three strikes law and found all specially alleged prior conviction allegations true.  The court sentenced Hernandez to an aggregate indeterminate state prison term of life without parole plus 115 years to life.

## DISCUSSION

1.  *The Trial Court Did Not Err in Instructing the Jury on Self-defense and Imperfect Self-defense and Denying Hernandez's Request for a Pinpoint Instruction*

  a.  *Governing law and standard of review*

Self-defense, when based on a reasonable belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification for homicide. (§ 197, subd. (3); *People v. Elmore* (2014) 59 Cal.4th 121, 133-134.)  For a killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend.  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1083; *People v. Horn* (2021) 63 Cal.App.5th 672, 682.)  What is objectively reasonable will depend on all the facts and circumstances, including the defendant's prior experience with his alleged attacker and knowledge about prior threats made or attacks inflicted by the aggressor on the defendant or someone else. (*Humphrey,* at p. 1083.)

An honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury,

often referred to as imperfect self-defense, negates malice and reduces what would otherwise be murder to voluntary manslaughter. (*People v. Duff* (2014) 58 Cal.4th 527, 561; *In re Christian S.* (1994) 7 Cal.4th 768, 773.) Imperfect self-defense is not a true defense but instead "a shorthand description of one form of voluntary manslaughter" (*People v. Barton* (1995) 12 Cal.4th 186, 200), comprising an unlawful killing in which the defendant, while harboring either an intent to kill (express malice) or a conscious disregard for life (implied malice) kills in the actual but unreasonable belief in the need to act in self-defense. (§ 192, subd. (a); *People v. Blakeley* (2000) 23 Cal.4th 82, 94, 89, 91.)

The trial court must give a requested instruction whenever there is substantial evidence to support it, that is, "'evidence sufficient to deserve jury consideration.'" (*People v. Leon* (2020) 8 Cal.5th 831, 848; see *People v. Marshall* (1997) 15 Cal.4th 1, 39-40.) When, as here, the defendant's request for a particular instruction was denied, we review the record de novo to determine whether there was substantial evidence that required giving the instruction. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) If so, the failure to so instruct is error. (*Leon*, at p. 848.) Conversely, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129; accord, *Marshall*, at pp. 39-40.)

b. *Relevant proceedings*

The court instructed the jury on complete self-defense in accordance with CALCRIM No. 505, which, among other things, told the jury that, "[w]hen deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they

11

were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed."[6]

Hernandez requested the court also instruct the jury with a modified version of optional language set forth in CALCRIM No. 505: "If you find that Arturo Ramirez or Michael Ramirez threatened or harmed the defendant [or others] in the past, you may consider that information in deciding whether the

---

[6] The court instructed in part, "A defendant is not guilty of murder if he was justified in killing in self-defense/or defense of another. The defendant acted in lawful self-defense or defense of another if: [¶] 1. The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger or death or great bodily injury to himself or someone else. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use the amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, a killing or attempted killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed."

12

defendant's conduct and beliefs were reasonable. [¶] If you find that the defendant knew that Arturo or Michael Ramirez had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable. Someone who has been threatened or harmed by a person in the past, is justified in acting more quickly or taking greater self-defense measures against that person. [¶] If you find that the defendant received a threat from someone else that he reasonably associated with Arturo or Michael Ramirez, you may consider that threat in deciding whether the defendant was justified in acting in self-defense or defense of another."

The court denied the request, concluding the instructions were complete as they were and nothing further was required.

> c. *There was no substantial evidence to warrant the additional pinpoint instruction; any error would be harmless in any event*

The optional language in CALCRIM No. 505 on antecedent threats by the victim or third parties the defendant associated with the victim are, in effect, pinpoint instructions. (See *People v. Moon* (2005) 37 Cal.4th 1, 30 [a pinpoint instruction highlights evidence supporting the defendant's theory of a case]; *People v. Garvin* (2003) 110 Cal.App.4th 484, 488 ["'[i]f an instruction relates "particular facts to the elements of the offense charged," it is a pinpoint instruction'"; instruction on the effect of antecedent threats in case involving self-defense is a pinpoint instruction]; see also Bench Notes to CALCRIM No. 505 [citing *Garvin* to explain when optional material in CALCRIM No. 505 is required].) A pinpoint instruction must be given on request

13

unless it is argumentative, duplicative, potentially confusing or not supported by substantial evidence. (*Moon,* at p. 30.)

Relying on *People v. Tafoya* (2007) 42 Cal.4th 147 (*Tafoya*) and *People v. Minifie* (1996) 13 Cal.4th 1055 (*Minifie),* Hernandez contends the instruction would have allowed the jury to consider Hernandez's knowledge of BGT's prior threats in deciding whether Hernandez actually and reasonably believed he needed to resort to deadly violence to protect himself. Neither case is particularly helpful to Hernandez. In *Tafoya* and *Minifie* the Supreme Court addressed alleged evidentiary error by the trial court, not instructional error, specifically, the admissibility of evidence the defendant had claimed was relevant to whether he actually and reasonably believed he needed to resort to deadly violence to protect himself. (See *Tafoya,* at p. 165 [defendant's knowledge of the victim's dangerousness is relevant to a self-defense claim; however, absent evidence that defendant knew Gattenby was dangerous, "evidence of Gattenby's reputation for being dangerous was not relevant to defendant's claim of self-defense"]; *Minifie,* at pp. 1065, 1068-1069 [evidence that third parties (not the victim) had threatened the defendant was relevant and admissible only if accompanied by evidence the defendant believed those parties to be associated with the defendant].)

Here, Hernandez did not rely on evidence of prior threats to explain his conduct, nor was there any need to do so. Rather, Hernandez's defense was that BGT members were armed; they shot first; and he returned fire in self-defense. The court's instruction to consider "all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have

believed" was correct and complete. (See *People v. Humphrey, supra,* 13 Cal.4th at pp. 1082-1083 [reasonableness of defendant's conduct is determined from the point of view of a reasonable person in the defendant's position; the jury must consider all the facts and circumstances it might "'expect[] to operate on [the defendant's] mind'"].)

Asked at oral argument whether there was any evidence of antecedent threats directed to Hernandez or his confederates, Hernandez's counsel responded that Sanchez had threatened Arturo over the telephone, telling him, "if this happens again, we're going to be knocking on doors." But that statement, made by Sanchez to BGT, not Arturo or his associates to Hernandez or his confederates, was not a threat to VNH or its members and associates. To the extent Hernandez contends Arturo's response to that remark, "slide through" or "come over," was itself a threat, or implies that the exchange itself created the specter of probable gang violence that influenced Hernandez's mental state in both bringing and firing the automatic weapon, the jury was told about it, distinguishing this case from the claim of evidentiary error at issue in *Tafoya* and *Minifie*. More significantly, the evidence was undisputed that, when the group arrived at Ramirez's house, they were met by a large group of BGT members armed with guns, making the comments during the earlier telephone call of comparatively little import to Hernandez's claim of self-defense.[7]

---

[7]     Hernandez's suggestion the first exchange of gunfire was itself a threat justifying the instruction is similarly without merit. The shooting at Hernandez by BGT gang members was not an antecedent threat of violence; it was violence.

15

In any event, even if error occurred, the failure to give the pinpoint instruction was harmless. (See *People v. Pearson* (2012) 53 Cal.4th 306, 325 [failure to give a proper pinpoint instruction is not federal constitutional error; it is evaluated under *Watson* "reasonable probability" standard of prejudice].) In asserting the omission was prejudicial, Hernandez emphasizes the jury was not instructed that a person in Hernandez's position—knowledgeable of prior threats or at the very least of BGT's prior acts of violence—would act more quickly to defend himself. However, the jury was fully instructed to consider all facts known to Hernandez. As for Hernandez's knowledge of the BGT gang and general acts of violence, the jury was also instructed in accordance with CALCRIM No. 1403 that it could consider gang evidence in determining whether "[t]he defendant actually believed in the need to defend himself." Because it convicted Hernandez of murder, not voluntary manslaughter, the jury necessarily rejected Hernandez's version of events—that, at the very least, he had a good faith belief his life was in danger and deadly force was necessary for his protection. On this record, the failure to give the requested pinpoint instruction, even if it were error, would be harmless.

### d. *CALCRIM No. 571 on imperfect self-defense was complete as given*

The court instructed with CALCRIM No. 571 that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant acted in imperfect self-defense or defense of another. The court instructed, "The defendant acted in imperfect self-defense or [imperfect] defense of another if: [¶] 1. The defendant actually believed that he or someone else was in imminent danger of being killed or suffering great bodily

16

injury; and [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; but [¶] 3. At least one of those beliefs was unreasonable. [¶] . . . [¶] In evaluating the defendant's beliefs consider all the circumstances as they were known and appeared to the defendant. . . [¶] . . . [¶] Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force."[8]

Echoing the argument he made in connection with CALCRIM No. 505, Hernandez contends the court erred in failing to provide a pinpoint instruction on Hernandez's knowledge of BGT's prior threats. CALCRIM No. 571 does not contain optional pinpoint language on antecedent threats; and Hernandez's counsel did not request one. Even if not forfeited (see *People v. Cole* (2004) 33 Cal.4th 1158, 1211 [pinpoint instruction must be requested or matter forfeited]; *People v. Kelly* (1992) 1 Cal.4th 495, 535 [same]), for the reasons discussed, the additional language was not warranted; and its omission was not prejudicial in any event. CALCRIM No. 1403 fully instructed the jury it could consider evidence of ongoing gang violence between BGT

---

[8] The court also instructed pursuant to CALCRIM No. 571, "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another. If the People have not met this burden, you must find the defendant not guilty of murder."

17

and VNH subsets in determining whether Hernandez actually believed in the need to defend himself with deadly force.[9]

Hernandez also argues CALCRIM No. 571 is incomplete because it omits as a possible basis for imperfect self-defense that the defendant actually believed he was in imminent danger and actually believed he needed to use deadly force but used an amount of force that was unreasonable under the circumstances. The argument is without merit.

Imperfect self-defense exists if the defendant acted under the honest belief that deadly force was necessary to protect himself but that belief (either relating to the need to defend or the amount of forced used) was unreasonable. (*People v. Elmore, supra*, 59 Cal.4th at p. 134.) It is the honest but unreasonable belief in the use of *deadly* force in a homicide case that negates malice and reduces the killing from murder to voluntary manslaughter. (*Ibid.*) That is precisely what the jury was instructed. There was no error.[10]

---

[9] Hernandez's argument his counsel's failure to request the additional language constituted ineffective representation thus necessarily fails. Hernandez cannot show his counsel's omission fell below an appropriate standard of care, let alone a reasonable probability he would have received a more favorable verdict had the request been made and granted. (*In re Gay* (2020) Cal.App.5th 1059, 1073; see *Strickland v. Washington* (1984) 466 U.S. 668, 694-695.)

[10] Hernandez's contention the court erred in failing to supplement CALCRIM No. 3470 with the same clarifying language relating to Hernandez's knowledge of antecedent threats by BGT gang members in determining whether he was justified in resorting to self-defense measures involving deadly

## 2. *The Trial Court Did Not Err in Denying Hernandez's* Brady *Motion To Declare a Mistrial or Strike Dr. Jorden's Testimony*

As discussed, during the second day of jury deliberations defense counsel learned of the two memoranda raising questions about Dr. Jorden's impartiality in cases involving the death of children. The court denied Hernandez's motion to declare a mistrial or, alternatively, to strike Dr. Jorden's testimony on the ground the nondisclosure of impeachment evidence violated *Brady*.

Due process requires the prosecution to disclose evidence that is favorable to the defendant and material to the issue of guilt or punishment. (*Brady, supra,* 373 U.S. at p. 86; *People v. Salazar* (2005) 35 Cal.4th 1031, 1042.) Evidence is favorable if it helps the defendant or hurts the prosecution. (*Salazar,* at p. 1042.) This includes evidence that may impeach a prosecution witness. (*Ibid.* ["[i]t is well settled that the prosecution's *Brady* obligation to disclose material evidence favorable to the defense encompasses impeachment evidence"]; *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8 [same].) Evidence is material under *Brady* only if there is a reasonable probability that, had it been disclosed to the defense, the result would have been different. (*In re Sassounian* (1995) 9 Cal.4th 535, 544 ["[t]he requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence the outcome' on the part of the reviewing court"]; see *People v. Jimenez* (2019) 32 Cal.App.5th 409, 418 [materiality requires more than a showing that the

---

force fails for the reasons discussed. No basis exists to treat this argument any differently from his argument relating to CALCRIM No. 505.

absence of the suppressed evidence made conviction more likely or that using the suppressed evidence might have changed the outcome of the trial; "'[a] defendant instead "must show a 'reasonable probability of a different result'"'"].)  A finding of *Brady* error is reversible under these standards without further harmless error review.  (*In re Sassounian*, at p. 545, fn. 7 [because there is no error unless there is prejudice, a *Brady* violation requires no further harmless error analysis; if there is error, it is reversible].)

Hernandez contends all three *Brady* requirements were established here:  the two memoranda cast doubt on Dr. Jorden's credibility as an unbiased pathologist; the memoranda were not produced; and, most importantly Hernandez argues, Dr. Jorden provided "critical" evidence at trial relating to the cause of death of Michael and Arturo:  In response to hypothetical scenarios posed to her, Dr. Jorden testified Arturo's and Michael's wounds "were consistent" with a defensive posture, reinforcing the prosecution's theory that Hernandez was the aggressor.

Hernandez relies on *People v. Deleoz* (2022) 80 Cal.App.5th 642 (*Deleoz*).  There, our colleagues in the Sixth District addressed the effect at a murder trial of the nondisclosure of certain material from the same memoranda.  In that case Dr. Jorden had testified the victim's injuries could not have resulted from a mere accidental fall.  The court acknowledged that Dr. Jorden's opinion—excluding accident as a manner of death—had provided a "'critical element of the prosecution's case.'"  (*Id*. at p. 666.)  However, because the jury found the defendant guilty of involuntary manslaughter rather than murder, necessarily rejecting Dr. Jorden's opinion, the court

ruled the third element of a *Brady* violation—prejudice—had not been established.  (*Id.* at pp. 666-667.)

In contrast to her testimony in *Deleoz,* Dr. Jorden's testimony in the case at bar was not material.  The cause of Arturo's and Michael's deaths was not an issue in the case, and Dr. Jorden's answers to hypothetical questions about how the wounds might have been inflicted was far from definitive.  Dr. Jorden was not asked, and did not opine, the wounds could only have been suffered in the way posed by the hypothetical or even that it was likely the wounds were sustained that way.  She simply testified nothing about the wounds was at odds with the prosecutor's case theory.  There is no reasonable probability the memoranda, if produced and used at trial to impeach Dr. Jorden, would have yielded a more favorable result for Hernandez.

3. *Assembly Bill 333 Requires Reversal of the Gang Conviction and Gang Enhancements*

Section 186.22. subdivision (b), provides for enhanced punishment when a defendant is convicted of a felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members."  Section 186.22 subdivision (a), makes it a criminal offense for a person who actively participates in a criminal street gang to willfully promote, further or assist in felonious conduct by gang members.

Assembly Bill 333 made a number of significant modifications to section 186.22, increasing the threshold for proving a gang participation offense and gang enhancements.  Under the principles enunciated in *In re Estrada* (1965) 63 Cal.2d 740, Assembly Bill 333's amendments to section 186.22's gang enhancement statute apply retroactively to defendants whose

21

convictions are not yet final. (*People v. Tran* (2022) 13 Cal.5th 1169, 1207; accord, *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087; *People v. E.H.* (2022) 75 Cal.App.5th 467.)

Previously, proof of a "pattern of criminal gang activity" as defined by section 186.22, subdivision (e), required evidence of two or more identified predicate offenses, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." As amended, subdivision (e) now requires proof that (i) the last offense used to show the pattern of criminal gang activity occurred within three years of the date the currently charged offense is alleged to have been committed; (ii) the offenses were committed on separate occasions or by two or more gang members, rather than simply "persons"; (iii) the offenses commonly benefited a criminal street gang, and the common benefit was more than reputational; and (iv) the currently charged offense cannot be used to establish the pattern.[11]

The Attorney General concedes the gang evidence at Hernandez's trial, presented under the former law, fell short of meeting the new proof requirements. Specifically, the Attorney

_____

[11] New section 186.22, subdivision (g), provides "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational." The new subdivision provides as examples of a common benefit that is more than reputational "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

General explains, the prosecution did not prove the predicate offenses identified by the People's gang expert were committed by more than one gang member or the last predicate offense took place within three years of the current offense. Hernandez agrees with the Attorney General's concession a remand for retrial of the gang participation conviction and gang enhancements is necessary. We agree, as well.

4. *Assembly Bill 333 Does Not Require Reversal of All Hernandez's Convictions*

Assembly Bill 333 also added section 1109, which requires, when requested by the defendant, that a gang enhancement charged under section 186.22, subdivision (b), be tried separately from, and after, determination of the defendant's guilt of the underlying offense. (§ 1109, subd. (a) (Stats. 2021, ch. 699, § 5).)[12]

Hernandez argues section 1109, like the rest of Assembly Bill 333's amendments, is retroactive to his case. (See *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743 [holding section 1109 is retroactive to nonfinal cases; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129 [same]; *People v. Montano* (2022) 80 Cal.App.5th 82, 108 [same].) The People argue it is not. (See *People v. Boukes* (2022) 83 Cal.App.5th 937, 948, review granted Dec. 12, 2022, S277103 [section 1109 is not an ameliorative statute that reduces punishment; accordingly, it does not apply retroactively]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Oct. 12, 2022, S275341 [same].)

---

[12] New section 1109, subdivision (b), provides a gang participation charge under section 186.22, subdivision (a), must "be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime."

23

The Supreme Court, while recently recognizing this split in appellate authority, has not yet addressed it, explaining that any error in not applying section 1109 retroactively would be harmless if the gang evidence would be admissible at trial even if the gang enhancement allegations were bifurcated. (See *People v. Tran, supra,* 13 Cal.5th at p. 1208 ["The question of whether section 1109 applies retroactively is the subject of a split of authority among the Courts of Appeal. [Citations.] We decline to resolve this split because we conclude that any asserted error in failing to bifurcate" was harmless under the standard for state error identified *Watson*]; see also *People v. Boukes, supra,* 83 Cal.App.5th at p. 948, review granted ["[e]ven if we were to hold that [section 1109] does apply retroactively, we would find in this case that any error in the lack of bifurcation was harmless"]; *People v. E.H., supra,* 75 Cal.App.5th at p. 480 ["[e]ven if section 1109 applied retroactively to his case . . . [defendant] cannot show it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated"].)

We need not wade into the conflict in the appellate courts.[13] The case at bar involved a gang dispute. As Hernandez implicitly recognizes, the gang's rivalries and prior activities were directly relevant to Hernandez's motive and his claim he acted in self-defense. While we agree with Hernandez that evidence of predicate acts—that members of VNH had been convicted of voluntary manslaughter, weapons possession and robbery in 2011 and 2012—as well as Detective Yasin's opinion the crimes

---

[13]     The Supreme Court's recent grant of review in *People Boukes, supra,* S277103, deferring decision pending consideration of the related issue in *People v. Burgos, supra,* S274743, suggests the Court is likely to resolve the conflict.

charged in the case at bar were committed to benefit a criminal street gang would likely have been excluded in a bifurcated trial on the underlying charges, the most damaging aspect of the gang evidence was relevant and admissible. On this record, there is no reasonable probability Hernandez would have obtained a more favorable verdict had the trial been bifurcated.

## DISPOSITION

Hernandez's gang participation conviction (count 4) and the true findings on the gang enhancements are reversed. The sentence imposed following trial is vacated. The cause is remanded to provide the People an opportunity to retry the gang participation offense and the criminal street gang enhancements. If the People elect not to do so, Hernandez is to be resentenced in a manner that is consistent with this opinion and with the terms of all applicable ameliorative legislation.


PERLUSS, P. J.

We concur:



SEGAL, J.



FEUER, J.


25