Filed 2/22/23  P. v. Hernandez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>RICHARD ESTEVAN HERNANDEZ,<br><br>  Defendant and Appellant. | F083649<br><br>(Super. Ct. No. F19906927)<br><br>**OPINION** |

## THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.  Adolfo M. Corona, Judge.

Kathleen Sherman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*      Before Peña, Acting P. J., Snauffer, J. and DeSantos, J.

Defendant Richard Estevan Hernandez was found guilty by a jury on five criminal counts related to an incident of intimate partner violence and a later incident of witness intimidation. He was sentenced to four years in prison. On appeal, defendant contends that the trial court erred in failing to stay, pursuant to Penal Code section 654,[1] the sentence on two of the three convictions related to the intimate partner violence incident and one of the two convictions related to the witness intimidation incident. The People concede that the trial court should have stayed the sentence on two of the convictions related to the intimate partner violence incident but disagree that one of the counts related to the witness intimidation incident should be stayed. We vacate defendant's sentence and remand for full resentencing. In all other respects, we affirm.

## PROCEDURAL SUMMARY

On September 9, 2021, the Fresno County District Attorney filed a consolidated first amended information charging defendant with inflicting corporal injury to a person with whom he had a dating relationship (§ 273.5, subd. (a); count 1), assault by force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), false imprisonment by violence (§ 236; count 3), making criminal threats (§ 422; count 4), dissuading a witness (§ 136.1, subd. (a)(1); count 5), and misdemeanor violation of a protective order (§ 166, subd. (c)(1); count 6). Counts 1 through 4 were alleged to have occurred on or about August 7, 2019; counts 5 and 6 were alleged to have occurred on or about December 26, 2019.

On September 22, 2021, the jury found defendant not guilty on count 4, but guilty on counts 1 through 3, 5, and 6.

On December 3, 2021, the trial court sentenced defendant to an aggregate term of four years as follows: on count 1, two years (the lower term); on count 2, two years, concurrent with the term on count 1; on count 3, one year four months, concurrent with

---

[1]     Undesignated statutory references are to the Penal Code.

2.

the term on count 1; on count 5, two years (the middle term), consecutive to the term on count 1; and on count 6, time served.

On December 8, 2021, defendant filed a notice of appeal.

## FACTUAL SUMMARY

**The Prosecution's Case**

Defendant and S.M. were in a dating relationship for approximately 18 months. They lived together for part of their relationship. In about July 2019, the home defendant and S.M. lived in together was foreclosed upon. In August 2019, S.M. lived in her father's home in Fresno along with her father, her son, and her brother. Defendant lived at his sister's home. On or about August 7, 2019, during the daytime, S.M. and her son visited defendant at his sister's home. She received a ride to defendant's sister's home from one of her friends.[2] On that date, it was not clear whether they were still in a dating relationship; they "kinda were, but … kinda weren't.… [They] were still talking." When she entered the home, things between S.M. and defendant were pleasant.

Eventually the two argued, at least in part, about one of S.M.'s male friends. S.M. attempted to walk away from defendant while they were in the driveway, outside of the home. She was planning to walk home. Defendant then dragged S.M. back toward the home by her hair. While still holding S.M.'s hair, defendant struck her head, near her hairline, on the concrete driveway. When her head struck the concrete, her vision "went all white." Defendant then began to choke S.M. while she was on the ground. She did not believe that she lost consciousness, but defendant choked her "long enough to where [she] couldn't breathe." She did not remember if he used one hand or two hands to choke her. Defendant also punched S.M. on the face more than five times. He told S.M. that "he was [going] to break [her] fingers and he [began] bending [her] fingers back." After

---

[2]     At the preliminary hearing, S.M. testified that defendant picked her up from her father's home.

3.

attacking S.M., defendant went inside his sister's home. S.M. picked her son up and ran away from the home.

As S.M. ran, she looked behind her and saw that defendant was chasing her. When S.M. saw defendant, he was approximately 38 feet away. Defendant yelled at S.M. and told her that he was going to stab her. She was scared. She believed that defendant might have a pocketknife in his pocket because he usually carried one; she did not see defendant holding a knife that day. As she ran, she saw some of defendant's neighbors outside. She did not know if they offered any assistance or said anything. At some point as she ran, she asked people nearby to call the police. After running for five-to-10 minutes, S.M. rounded a corner and stopped running. She asked a passing bicyclist if she could use his phone because defendant had taken her phone at some point before she left his sister's home.

S.M. called a female family friend, M.V., and asked her to pick S.M. and her son up at a nearby corner store. Roughly 10 minutes later, M.V. arrived at the corner store, and S.M. and her son entered M.V.'s vehicle. Defendant arrived at the corner store in a vehicle with another male as S.M. was getting into M.V.'s vehicle. M.V. and S.M. both demanded that he return S.M.'s phone. He did not return the phone. M.V. drove S.M. and her son to S.M.'s father's home. On the drive to her father's home, S.M. told M.V. what had happened. When they arrived at S.M.'s father's home, M.V. spoke to S.M.'s father and S.M. and her son went inside. S.M. then spoke to her father but did not discuss what happened because she "really didn't want to talk about it." S.M. said she "didn't have to tell him [what happened with defendant]. He already knew who it was." S.M.'s father then called 911 to report the incident.

That day, Fresno Police Officer Katherine Gregory interviewed S.M. at her father's home and documented her injuries. S.M. had visible injuries: to her head, near her hairline, where defendant struck it on the concrete driveway; bite marks near her right upper cheek bone, one of her ears, and her right upper arm where defendant bit her;

4.

marks on her neck where defendant choked her; marks on her left knee and right ankle from being dragged by defendant; and marks on both sides and the front of her neck, her collar bone, one of her arms, and her right wrist. She had none of those marks before defendant attacked her.

In late December 2019, defendant went to S.M.'s father's home while she was there. S.M. expected defendant's visit because they had been sending each other text messages. They talked outside the home for approximately 10 minutes and defendant told S.M. "not to go to court." He told her that if she did not go to court then his case would be dropped.

S.M. did not know of any infidelity in the relationship between her and defendant. She did not recall whether, on August 7, 2019, anyone other than defendant, S.M., and her son were in defendant's sister's home while she was there. She did not recall what her son was doing while he was inside the home. She also did not recall whether any vehicles other than defendant's vehicle were parked at defendant's sister's home on that date.

S.M.'s father, A.M., testified that on August 7, 2019, S.M. and her son returned to his home in the afternoon, before dark, at 3:30 p.m. or 4:00 p.m., after having been gone for either a "couple hours" or "two hours. S.M. came home crying and had bite marks on her arms, bruises, and other injuries. S.M.'s son was visibly upset. S.M. asked A.M. not to call the police. A.M. called the police himself. About 10-to-15 minutes later, the police arrived at A.M.'s home.

Gregory was dispatched to A.M.'s home at approximately 4:20 p.m. on August 7, 2019, and arrived approximately 10 minutes later. She interviewed S.M. on the porch of the home and documented her injuries. S.M. told Gregory that her son was not at defendant's home during the incident.[3] A.M. confirmed that S.M.'s son was at his home

---

[3] S.M. testified that she told Gregory that her son was not at defendant's home because she knew defendant's home was an unsafe environment and she was concerned

with him while A.M. was gone.[4]  S.M. also reported that, as she fled defendant's sister's home, she asked people outside to call the police for her.  S.M. did not report to Gregory that defendant had followed her to the corner store after the incident.

Gregory went to defendant's sister's home to find him.  She saw an unknown male in front of the home.  He entered the home.  When she and other officers knocked on the door to the residence there was no answer.

**Defendant's Case**

Defendant's sister, M.J., testified that she had met S.M. numerous times.

On August 7, 2019, M.J. was seated on the couch in her living room watching television when S.M. arrived at approximately 2:00 p.m. or 3:00 p.m.[5]  She did not recall whether S.M. came inside.  She was able to see S.M. on the patio in front of the home by looking through a window.  She did not remember seeing S.M.'s son.  She could hear defendant and S.M. talking but could not make out the words; the two were talking loudly but not shouting.  M.J. could not tell if the two were arguing.  M.J went to the front patio twice:  first, to tell the two to be quiet; second, to tell the two to leave.  She saw no marks on S.M.  Nor did she see defendant touch S.M. or S.M. touch defendant.  The two were on the patio together for approximately 10 or 15 minutes.  M.J. did not see S.M. leave but she did notice defendant reenter her home by himself.  He walked to the couch and sat.  "He seemed his normal self"; he did not appear to be upset or angry; he was not sweating.  He did not leave the home after S.M. left.

---

that telling Gregory that he was there would have resulted in an investigation of her care of her son.

[4]     A.M. testified that S.M. took her son with her and her son was not at home with him during the incident.

[5]     M.J. later clarified that she believed S.M. arrived at approximately 2:00 p.m. or 3:00 p.m. because that is when she first heard S.M. and defendant talking on the patio. She did not know if S.M. had been at the home for a longer period.

M.J. acknowledged that she had previously spoken to an investigator. She told the investigator that, after S.M. left on August 7, 2019, defendant told her that S.M. had come over to the home to "get back together with him."

Defendant testified that he and S.M. dated for about a year and lived together for about nine months. While they lived together, defendant and S.M. argued and he suspected her of infidelity. Defendant believed that S.M. was only in a relationship with him out of convenience because she needed a place to live. When defendant moved in with M.J., he cared about S.M. and they continued to see each other, but he did not say whether they continued to be in a dating relationship.

By August 7, 2019, defendant and S.M. were no longer dating. Defendant believed S.M. already had a different boyfriend or was pursuing a new boyfriend. They had previously talked about S.M.'s relationship with the other man. It did not bother defendant that S.M. was unfaithful to him. On August 7, 2019, S.M. came over to M.J.'s home at some time between about noon and 3:00 p.m. Defendant did not know whether S.M.'s son was with her and did not know how S.M. got to M.J.'s home. Defendant believed that S.M. probably text messaged him before she came over because that was her normal practice. When she arrived, the two went into one of the rooms in the home. S.M. charged her phone in the room and defendant read her text messages, which were from another man.[6] S.M. told defendant that she wanted to get back together with him and they discussed her relationship with another man. They argued loudly and defendant decided that they should go outside the home to avoid disturbing M.J. Defendant did not take S.M.'s phone; she left the phone to charge in the room when they went outside.

Outside, on the patio, defendant rejected S.M.'s advances because he believed that she had a different boyfriend. They continued to be loud and M.J. came outside twice to

---

[6]     Defendant also testified that he did not look at S.M.'s text messages until after she left the home on August 7, 2019.

tell them to be quiet. After about five or 10 minutes on the patio, defendant walked away from S.M., told her he was going to return (although he did not intend to do so), reentered the home, and sat by his sister on the couch. He did so to try to "d[e]fuse" the argument. He did not see S.M. leave but after a minute or two, he noticed that he could no longer see her on the patio through the window. He went to the patio to see if S.M. was there but she was gone. Defendant did not chase after her or follow her in a vehicle. He returned to the living room and sat down. Within an hour, he left the home. He did not remember where he went, but it was not to A.M.'s home and he did not see S.M. for the remainder of the day.

Defendant testified that at no point on August 7, 2019, did he hit, strangle, drag, or threaten S.M. Defendant did not see any marks on S.M. while she was at M.J.'s home.

Defendant did not go to A.M.'s home in December 2019. A.M.'s family did not like defendant. He believed that if he had gone to A.M.'s home he would have been "jumped" or "beat up." He did not tell S.M. not to come to court. However, when he learned that there was a warrant for his arrest, but prior to his arrest, he did tell S.M. to "Fix it. You need to fix this." When he said that, he meant, "whatever you did … fix it because … I ain't gonna be getting no s[**]t because of you." Defendant was not certain when or how he found out about the warrant but he believed that S.M. told him.

Defendant did not know if he had seen the copy of the criminal protective order that he was served with on October 11, 2019. He testified that he "rarely read" the papers given to him. He also testified that after the date of his arrest in this matter, he had no contact with S.M.

## DISCUSSION

### I. Section 654

Defendant contends that the trial court erred in failing to stay the sentence on two of the first three counts of conviction, and on either count 5 or 6. The People concede that the court erred in failing to stay two of the first three counts of conviction.

8.

However, the People contend the record supports the court's implied finding that defendant's attempt to dissuade S.M. (count 5) occurred on a separate date than defendant's violation of the protective order (count 6). Accordingly, they argue, counts 5 and 6 were not committed as part of a single transaction and section 654, therefore, did not prohibit multiple punishments on those counts. We accept the People's concession as to counts 1 through 3 and agree with the People regarding counts 5 and 6. Because section 654 grants the trial court discretion regarding which sentences to stay, we remand the matter for the trial court to exercise its discretion in the first instance regarding which two of counts 1 through 3 to stay.

## A. Additional Background

The parties agree, as do we, that the trial court appears to have considered the offenses in two groups—counts 1 through 3, relating to the August 7, 2019 incident; and counts 5 and 6, relating to defendant's later contacts with S.M. However, the court did not explicitly identify the conduct underlying counts 5 or 6 or discuss whether the conduct underlying those offenses was the same or occurred as part of the same transaction.

The trial court further expressed that it would have imposed a lesser sentence than the four-year term it imposed, but not so low as two years. The court explained section 1170.15 mandated that it impose either a consecutive full middle term on count 5 (rather than one-third the middle term) or impose the sentence on that count concurrently. The court elected to impose the full middle term consecutively. It found that running the sentence on count 5 concurrently with the sentence on count 1 would not "be appropriate."

## B. Relevant Legal Principles and Standard of Review

At the time of defendant's sentencing, section 654, subdivision (a) provided that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of

imprisonment, but in no case shall the act or omission be punished under more than one provision." Effective January 1, 2022, Assembly Bill No. 518 (2021–2022 Reg. Sess.; Assembly Bill 518) modified section 654, subdivision (a), to permit an act or omission punishable under two or more provisions of law to "be punished under either of such provisions." (Stats. 2021, ch. 441, § 1.)

The inquiry to determine whether separate sentences can be imposed pursuant to section 654 is "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19; *People v. Correa* (2012) 54 Cal.4th 331, 335–336.) That inquiry turns on "the intent and objective" of the defendant. (*Correa*, at p. 336.) " 'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Ibid*.) " 'Where a defendant entertains multiple criminal objectives independent of and not merely incidental to each other, he may be punished for more than one crime even though the violations share common acts or are parts of an otherwise indivisible course of conduct.' " (*People v. Jimenez* (2019) 32 Cal.App.5th 409, 425–426.) Further, "multiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm. [Citations.] 'Separate sentencing is permitted for offenses that are divisible in time .…' " (*People v. Felix* (2001) 92 Cal.App.4th 905, 915.)

"The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination." (*People v*. *DeVaughn* (2014) 227 Cal.App.4th 1092, 1113.) Where the trial court makes no express section 654 findings, we consider whether substantial evidence supports an implied finding of separate transactions. (See *People v. Islas* (2012) 210 Cal.App.4th 116, 129; *DeVaughn*, at p. 1113.) " ' "We must 'view the evidence in a light most favorable to the respondent and presume in support of the

[sentencing] order the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' [Citation.]" [Citation.]' " (*DeVaughn*, at p. 1113.)

### C. Analysis

The parties agree, as do we, that counts 1 through 3 all arose out of the same indivisible transaction and in committing those offenses defendant harbored the same intent and objective—defendant hit, bit, choked, and dragged S.M., and struck S.M.'s head against the concrete in a single, uninterrupted course of conduct, thereby committing the offenses of corporal injury on a person with whom he had a dating relationship (count 1), assault by force likely to cause great bodily injury (count 2), and false imprisonment by force (count 3). Pursuant to section 654, the trial court should have stayed the sentence on all but one of those counts.[7] (*People v. Correa*, *supra*, 54 Cal.4th at pp. 335–336.) Substantial evidence does not support a finding that defendant's intent in committing the false imprisonment was anything other than incidental to his intent to harm S.M. (*People v. Jiminez*, *supra*, 32 Cal.App.5th at pp. 425–426.)

Next, defendant contends that counts 5 and 6 were based on the same conduct and multiple punishment was therefore precluded by section 654. The People argue that substantial evidence supports the trial court's implied conclusion that section 654 did not bar multiple punishments. We agree with the People.

Substantial evidence supports the trial court's implied finding that defendant had at least two contacts with S.M. after August 7, 2019—at least one contact prior to issuance of the October 11, 2019 protective order, during which he told S.M. to "fix it" in regards to his outstanding warrant; and at least one contact after issuance of the protective order, in late December 2019, during which he told S.M. not to go to court so his case

---

[7] Again, on the date of defendant's sentencing, the trial court was required to impose and not stay the sentence on the count permitting the longest possible sentence. On remand, the court may exercise its discretion to impose and not stay the sentence on any one of the first three counts of conviction. (§ 654, subd. (a).)

11.

would be dismissed. Defendant testified that he found out about the warrant for his arrest before his arraignment in this case; he "wasn't even going to court yet."[8] When he found out that there was a warrant for his arrest, he told S.M. that she had to "[f]ix it." He explained that he intended S.M. to understand that "whatever you did, man, s[**]t, you know, fix it because, you know, I ain't gonna be getting no s[**]t because of you."

S.M. also testified that defendant contacted her in late December 2019. Specifically, she testified that defendant drove to A.M.'s home, after having exchanged text messages with S.M. They met outside of A.M.'s home and defendant told S.M. "not to go to court [¶] … [¶] so that the case can be dropped." Taken in combination, S.M.'s testimony and defendant's testimony provided substantial evidence for the trial court's implied finding that defendant attempted to dissuade S.M. prior to issuance of the protective order and had contact with S.M. after issuance of the protective order in a second attempt to dissuade her from testifying against him. We find no error in the court's decision not to stay the sentence on count 6.[9]

---

[8]    Defendant's testimony was not clear about who told him that a warrant for his arrest had been issued. He suggested it might have been S.M. or one of her friends. Defendant's testimony was also unclear about precisely when he learned of the existence of the warrant. His testimony could also be understood to mean that he did not know he had a warrant for his arrest on the date of his arrest in October 2019.

[9]    Defendant also argues that the trial court did not understand that it had the discretion to impose the sentence on count 5 concurrently rather than consecutively pursuant to section 1170.15. We disagree. Defendant's trial counsel request that the trial court impose the sentence on count 5 to run concurrently with the sentence on count 1. In response, the trial court answered: "I appreciate that information. I think that's accurate." It further explained that count 5, "*if it's run consecutively*, … would be the full term, full middle term of two years." (Emphasis added.) Then in imposing the sentence, the trial court commented not that it lacked the discretion to impose the sentence on count 5 concurrently, but that doing so would not be "appropriate." The trial court understood its discretion to either impose a two-year full middle term consecutively or a concurrent term.

In any event, because we remand the matter for full resentencing, the trial court may reconsider its discretionary choice and we need not resolve the issue.

## DISPOSITION

Defendant's sentence is vacated and the matter is remanded for full resentencing consistent with amended section 654, as modified by Assembly Bill 518.